UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| D. JOSEPH KURTZ, Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiff, | § § | Civil Action No.: 1:14-cv-01142 |
| v. | § § | |
| KIMBERLY-CLARK CORPORATION and COSTCO WHOLESALE CORPORATION, | § § § | |
| Defendants. | § § § | |

**REBUTTAL DECLARATION OF KEITH R. UGONE, PH.D.**

**March 27, 2015**

HIGHLY CONFIDENTIAL

# REBUTTAL DECLARATION OF KEITH R. UGONE, PH.D.

## March 27, 2015

I.    OVERVIEW OF ASSIGNMENT ................................................................. 1

II.   SUMMARY OF OPINIONS ...................................................................... 2

III.  MR. WEIR'S PROPOSED PRICE PREMIUM APPROACHES DO NOT YIELD A RELIABLE OR RELEVANT MEASURE OF CLAIMED DAMAGES ON A CLASS-WIDE BASIS ................................................................. 5

    A.  Mr. Weir Oversimplified The Challenged Claims ................................. 5

    B.  Mr. Weir Failed To Address The Large Number Of (And Differences Among) Challenged Products ........................................................... 6

    C.  Mr. Weir Ignored Individualized Factors That Must Be Evaluated To Determine Economic Injury ...................................................... 9

    D.  Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Ignores Significant Variations In Purchase Prices ................ 10

    E.  Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Inappropriately Relies Upon A "Fraud On The Market" Type Theory ...................... 12

IV.   PROPOSED PRICE PREMIUM APPROACH: MR. WEIR OFFERED ONLY A GENERALIZED AND INCOMPLETE DESCRIPTION OF HIS PROPOSED HEDONIC REGRESSION ANALYSIS ................................................ 13

    A.  Mr. Weir Failed To Fully Define His Proposed Regression Model ............ 14

    B.  Mr. Weir Failed To Identify The Comparator Products He Would Use, Let Alone Comparator Products Without A "Flushable" Claim ................ 15

    C.  Mr. Weir Provided An Incomplete List Of Explanatory Variables ........... 18

    D.  Mr. Weir Failed To Establish The Availability Of Necessary Data .......... 20

    E.  Mr. Weir Failed To Explain How He Would Account For (Or Reconcile) Different Results Concerning A Claimed Price Premium ................ 21

    F.  Mr. Weir Provided No Method For Allocating Claimed Damages To Putative Class Members Without Individualized Inquiry ................ 23

V.    PROPOSED PRICE PREMIUM APPROACH: MR. WEIR'S REVIEW OF HEDONIC REGRESSION ANALYSES USED IN OTHER STUDIES DOES NOT PROVIDE ASSURANCES THAT HIS PROPOSED ANALYSIS IS WORKABLE IN THIS MATTER ................................................ 23

VI.   PROPOSED PRICE PREMIUM APPROACH: MR. WEIR FAILED TO EXPLAIN HOW HE WOULD OVERCOME COMMON DRAWBACKS TO HIS PROPOSED SURVEY APPROACHES ........................................ 25

    A.  Mr. Weir's Proposed Survey Approaches At Best Would Measure An Average Willingness To Pay, Not An Actual Price Premium Paid ........... 26

    B.  Proposed Survey Approaches Draw Attention To Features That May Not Be Considered By Customers When Making Actual Purchase Decisions ........ 29

    C.  Proposed Survey Approaches Cannot Provide A Value Tied To The Putative Class Period .................................................................................................................. 29

VII.    **MR. WEIR'S PROPOSED FULL REFUND APPROACH DOES NOT YIELD A RELIABLE OR RELEVANT MEASURE OF CLAIMED DAMAGES ON A CLASS-WIDE BASIS.................................................................................. 30**

    A.  No Adjustment For Value Received By Consumers .................................... 31

    B.  Provides A Refund To Consumers Who Suffered No Economic Injury .................... 31

    C.  Ignores Significant Variations In Retail Prices............................................ 32

    D.  No Allocation Method Provided.................................................................... 33

VIII.    **MR. WEIR'S PROPOSED STATUTORY DAMAGES APPROACH WOULD RESULT IN WINDFALL GAINS TO INDIVIDUALS WHO SUFFERED NO INJURY ....................................................................................................... 33**

IX.    **MR. WEIR DID NOT ACCOUNT FOR ALLEGED PLUMBING DAMAGES EXPERIENCED BY PUTATIVE CLASS MEMBERS............................... 34**

## REBUTTAL DECLARATION OF KEITH R. UGONE, PH.D.

### March 27, 2015

I, Keith R. Ugone, declare as follows:

## I.   OVERVIEW OF ASSIGNMENT

1.   I am an economist and have been retained by counsel for Kimberly-Clark Corporation ("Kimberly-Clark" or "Defendant") to offer my opinions regarding various economic and associated issues relevant to the matter of *D. Joseph Kurtz v. Kimberly-Clark Corporation, et al.* I submitted a declaration in this matter on February 27, 2015 (the "Ugone Declaration").[1] In the Ugone Declaration, I evaluated from an economic perspective whether standard economic analysis can be used to quantify reliably the damages being asserted in this matter on a Class-wide basis using common proof. I concluded that the claimed injury and/or claimed damages (if any) suffered by putative Class members as a result of the Challenged Claims cannot be evaluated reliably on a Class-wide basis using common proof.[2]

2.   Mr. Colin B. Weir, retained by Plaintiff's counsel, also submitted a declaration on February 27, 2015 in this matter (the "Weir Declaration").[3] In the Weir Declaration, Mr. Weir proposed the following approaches to calculating claimed damages on a Class-wide basis.

   a.   <u>Price Premium Damages</u>. Mr. Weir proposed to determine "the difference between the value (purchase price) of the Products and the value of the Products had the claim

---

[1]   Declaration of Keith R. Ugone, Ph.D. dated February 27, 2015 ("Ugone Declaration").

[2]   As discussed in the Ugone Declaration, the Challenged Claims include "flushable," "break up after flushing," and "sewer and septic safe." The Challenged Products include 18 flushable wipes products sold under various Kimberly-Clark brands, including Cottonelle, Scott, Pull-Ups, Kotex, Poise, Kleenex, Scottex, and Andrex. (Ugone Declaration, p. 1.)

[3]   Declaration of Colin B. Weir dated February 27, 2015 ("Weir Declaration").

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

not been made," using either (i) hedonic regression or (ii) survey techniques such as contingent valuation or conjoint analysis.[4]

    b.  <u>Full Compensatory Damages</u>.  Mr. Weir proposed to calculate a "full recovery" "wherein consumers would receive a full refund for their purchases of the Products."[5]

    c.  <u>Statutory Damages</u>.  Mr. Weir proposed to calculate "statutory damages of $50 per violation" under New York General Business Law § 349.[6]

3.    I have been requested by counsel for Kimberly-Clark to independently evaluate from an economic perspective the opinions contained in the Weir Declaration.[7]

## II.   <u>SUMMARY OF OPINIONS</u>[8]

4.    Based upon (a) my economics and damages quantification training and experience, (b) documentary evidence, (c) deposition testimony, (d) the detailed analyses presented in the Ugone Declaration, and (e) my review of the Weir Declaration, I have concluded that the approaches proposed by Mr. Weir would not provide a reliable or relevant measure of the claimed damages (if any) suffered by putative Class members on a Class-wide basis for at least the following reasons.

    a.  Mr. Weir's proposed price premium approaches do not yield a reliable or relevant measure of claimed damages on a Class-wide basis.

---

[4] Weir Declaration, pp. 5 – 6.  Mr. Weir only mentioned a contingent valuation or conjoint analysis approach in a single footnote in his declaration (n. 14), in which he simply described the two survey methods without explaining how either would be applied to this case.  He did not explicitly state whether he was proposing to use either approach, but, in the event that he proposes to do so, this rebuttal declaration explains that neither approach would yield a reliable or relevant measure of claimed damages on a Class-wide basis.

[5] Weir Declaration, p. 5.

[6] Weir Declaration, pp. 5 and 14.

[7] My resume is contained in **Rebuttal Exhibit 1**.  My trial and deposition testimony that took place after the issuance of my first declaration is contained in **Rebuttal Exhibit 2**.  My trial and deposition testimony that took place prior to the issuance of my first declaration is contained in Exhibit 2 to the Ugone Declaration.  **Rebuttal Exhibit 3** contains a listing of facts, data, and information received subsequent to the issuance of my first declaration.  A listing of facts, data, and information received prior to the issuance of my first declaration is contained in Exhibit 3 to the Ugone Declaration.

[8] This Summary of Opinions is intended to be an overview.  A full description of my opinions is contained throughout this rebuttal declaration and in the Ugone Declaration (i.e., narrative and associated exhibits).

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

i. Mr. Weir oversimplified the Challenged Claims. Mr. Weir failed to acknowledge the complexities associated with the different flushability-related claims that have appeared on (and been removed from) the various Challenged Products over time.

ii. Mr. Weir failed to address sufficiently the large number of Challenged Products which are sold under different brands and in a wide range of package sizes and configurations.

iii. Mr. Weir ignored individualized factors that must be evaluated to determine economic injury, such as putative Class members' reasons for purchase and purchase satisfaction, *inter alia.*

iv. Mr. Weir's proposed determination of a Class-wide claimed price premium ignores significant variation in purchase prices paid by putative Class members.

v. Mr. Weir's proposed determination of a Class-wide claimed price premium inappropriately relies upon a "fraud on the market" type theory.

b. Mr. Weir offered only a generalized and incomplete description of his proposed hedonic regression analysis without identifying appropriate comparator products or an exhaustive list of explanatory variables that he would use (even if such a list would be preliminary).

i. Mr. Weir failed to fully define his proposed regression model (even if such a defined model would be preliminary).

ii. Mr. Weir failed to identify the comparator products he would use, including comparator products without a "flushable" claim.

iii. Mr. Weir provided an incomplete list of explanatory variables, and failed to establish that he could identify reliably a complete list of explanatory variables.

iv. Mr. Weir failed to establish the availability of necessary data to implement his proposed hedonic regression analysis.

v. While Mr. Weir identified the possibility of a "constant-dollar" price premium or a "percentage of purchase price" price premium, Mr. Weir failed to specify which would be used (or tested) or which is more appropriate.

vi. Mr. Weir failed to explain how he would account for (or reconcile) different results concerning a claimed price premium that are likely to arise, especially given the six putative Classes proposed in this matter.

vii. Mr. Weir provided no method for allocating claimed damages to putative class members without individual inquiry.

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

c. Mr. Weir's review of hedonic regression analyses used in other studies does not provide assurances that his proposed analysis is workable in this matter.

d. Mr. Weir failed to explain how he would overcome common drawbacks to his proposed survey approaches (i.e., contingent valuation and conjoint analysis).

    i. Mr. Weir's proposed survey approaches at best would measure an average willingness to pay, not an actual price premium paid.

    ii. The proposed survey approaches draw attention to features that may not be considered (or only would be considered to a lesser degree) by customers when making actual purchase decisions.

    iii. The proposed survey approaches cannot provide a value tied to the putative class period.

e. Mr. Weir's proposed full refund approach does not yield a reliable or relevant measure of claimed damages on a Class-wide basis.

    i. The "full refund" approach proposed by Mr. Weir does not appropriately take into account the value received by each putative Class member from use of the Challenged Products.

    ii. Mr. Weir's proposed "full refund" approach ignores individualized factors that must be evaluated to determine economic injury and consequently would result in a windfall gain to individuals who actually suffered no injury.

    iii. Mr. Weir's proposed "full refund" approach ignores significant variations in purchase prices paid by putative Class members.

    iv. Mr. Weir has not provided a mechanism for allocating to individual putative Class members the portion of the proposed "full recovery" measure associated with each individual Class member's purchase(s).

f. From an economic perspective, Mr. Weir's proposed statutory damages calculation would result in windfall gains to a significant number of putative Class members who were not injured as a result of the Challenged Claims, including putative Class members (i) who purchased the Challenged Products for reasons unrelated to the Challenged Claims, (ii) who were satisfied with their purchases, and/or (iii) who did not experience plumbing problems associated with the Challenged Products, *inter alia*. Conversely, Mr. Weir's proposed statutory damages approach would fail to compensate Class members whose alleged actual damages exceed statutory limits.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

g. None of Mr. Weir's proposed approaches address the plumbing expenses allegedly incurred by certain putative Class members.[9]

5. The details of my evaluation of the Weir Declaration and the bases for my opinions are contained in the remainder of this rebuttal declaration.

## III. MR. WEIR'S PROPOSED PRICE PREMIUM APPROACHES DO NOT YIELD A RELIABLE OR RELEVANT MEASURE OF CLAIMED DAMAGES ON A CLASS-WIDE BASIS

6. From an economic and claimed damages perspective, Mr. Weir's proposed approaches for calculating a claimed Class-wide price premium (i.e., hedonic regression, conjoint analysis, or contingent valuation) do not yield a reliable or relevant measure of the alleged harm suffered by putative Class members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.[10]

### A. Mr. Weir Oversimplified The Challenged Claims

7. Mr. Weir stated that "Plaintiff alleges that the 'flushable' claims are false or misleading," and he proposed calculating a price premium "due to the 'flushable' mislabeling of the Products."[11] However, Mr. Weir failed to acknowledge the complexities associated with the different flushability-related claims that have appeared on the various Challenged Products over time. For example, certain of Kimberly-Clark's Challenged Products also have been labeled as "sewer and septic safe" and/or state "break up after flushing."[12] To

---

[9] *See* Ugone Declaration, Section IX.

[10] Mr. Weir asserted that his proposed regression analysis (based upon *retail prices* of the Challenged Products) "can also be used to determine the amount of additional revenue and/or profit gleaned by Defendants as a result of the 'flushable' misrepresentation." (Weir Declaration, p. 6.) However, retail prices are paid to retailers, not to Kimberly-Clark. An alleged premium in *retail prices* paid by consumers does not provide a measure of gains to Kimberly-Clark (neither in terms of revenues nor profits). Nor would there necessarily be a correlation between (a) the percentage of an average retail price allegedly attributable to the "flushable" claim and (b) the percentage of Kimberly-Clark's wholesale revenues or profits attributable to the claim.

[11] Weir Declaration, pp. 2 and 14.

[12] See, *e.g.*, Class Action Complaint dated February 21, 2014 ("Complaint"), pp. 5 – 8.

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

the extent these and other flushability-related claims have changed over time (which they have[13]) or cause a different interpretation of the "flushable" claim, Mr. Weir has not explained how his proposed "price premium" analyses would account for the differences in the flushability-related claims across Challenged Products and over time (or whether the different claims could lead to different asserted price premiums, if any). The aforementioned deficiencies mean Mr. Weir's proposed price premium approaches will not yield a result appropriately matching asserted price premiums allegedly associated with the Challenged Products and the Challenged Claims viewed by putative Class members.

**B. Mr. Weir Failed To Address The Large Number Of (And Differences Among) Challenged Products**

8. Mr. Weir did not acknowledge the complexities associated with determining an alleged price premium for each of Kimberly-Clark's 18 Challenged Products (in addition to Costco products), which are sold under different brands and in a wide range of package sizes and configurations (e.g., travel pack, tub, dispenser, and refills). Although Mr. Weir identified "Brand," "Package count/size," and "Tub vs. refill pack" among the "relevant product attributes" "that can be controlled for by the hedonic regression,"[14] Mr. Weir did not explain the manner in which his proposed analysis would "control for" these differences. Depending upon the brand, package size, and configuration, retail prices per package range from less than ▮▮▮▮▮▮▮▮▮▮▮▮[15] In addition, Kimberly-Clark's different brands of Challenged Products are intended to appeal to different types of

---

[13] *See, e.g.,* O'Connor Deposition, pp. 53 – 54 and 154.

[14] Weir Declaration, p. 10.

[15] *See* Ugone Declaration, pp. 26 – 27. *See also, e.g.,* "Cottonelle Fresh Care Flushable Wet Wipes," NorthShore Care Supply. (http://www.northshorecare.com/wipes-flushable.html, viewed on March 6, 2015.)

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

consumers (i.e., different market segments). The Cottonelle and Scott brands provide two examples.

    a. Cottonelle is marketed as a "premium" brand for consumers who "[e]valuate value based [o]n premium brand and experience."

    b. Scott is marketed as a "pragmatic" brand (or "value" brand) for consumers who "[e]valuate value based on branded quality at a fair price."[16]

9.    The marketing of various Challenged Products under different brands and in different market segments likely affects not only the purchase prices of the Challenged Products but also the extent to which the Challenged Claims may contribute (if at all) to any claimed price premium for a particular Challenged Product. In other words, the impact (if any) of the Challenged Claims may be different for different brands of Challenged Products. Mr. Weir did not explain how he would address this complexity in his proposed price premium analysis.

10.    Mr. Weir's failure to assess the complexity associated with the large number of Challenged Products is further demonstrated through a discussion of Mr. Weir's proposed hedonic regression approach. Mr. Weir did not explain whether he would perform a <u>single</u> regression analysis including all products or <u>separate</u> regression analyses (a) for each *Defendant* (i.e., Kimberly-Clark and Costco), (b) for each *brand* of Challenged Products, (c) for each *package size* of Challenged Product, or (d) for each individual Challenged Product. If Mr. Weir does not plan to run separate regressions, then it appears he will be attempting to calculate a single claimed "price premium" for the

---

[16] "Scott 2013 Initiatives Overview," presentation dated June 1, 2013. (DCC-Kurtz0010637 – 677 at 672.) Kimberly-Clark contrasted its "premium" brand (i.e., Cottonelle) and its "pragmatic" brand (i.e., Scott) to private label products marketed as an "economic" option for consumers who "[e]valuate value only based on price." *See also, e.g.,* O'Connor Deposition, pp. 85 – 86. Ms. O'Connor testified that Cottonelle is understood by consumers to be a "premium" brand, whereas Scott is understood to be a "value" brand.

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

"flushable" claim, either "on a dollar basis" or "on a percentage basis,"[17] to be applied to *all* Challenged Products (regardless of whether the products were priced at ███████.

Such an approach would fail to determine reliably Class-wide claimed damages.

a.  <u>No Support For Single Price Premium On A Dollar Basis</u>.  By calculating a Class-wide claimed price premium "on a dollar basis," Mr. Weir would be assuming that the "flushable" claim contributed the same value (as a dollar amount) to the prices of all Challenged Products regardless of brand, package size, and configuration. However, there is no reason to assume, for example, that the "flushable" claim contributes the same value (as a dollar amount) to the price of a ██ travel pack as it does to a ██ large box of 346 refills, especially given that the Challenged Claims (as asserted by the Named Plaintiff) are applicable to a greater number of wipes in the large refill box.[18]   As an additional example, the "flushable" claim may not command the same alleged price premium when applied to a "value" brand (such as Scott) as when applied to a "premium" brand (such as Cottonelle), given that the different brands are intended to appeal to different types of consumers (with different price sensitivities).   These observations indicate that Mr. Weir's proposed calculation of a single price premium "on a dollar basis" would be unreasonable to apply across all Challenged Products.

b.  <u>No Support For Single Price Premium On A Percentage Basis</u>.  By calculating a Class-wide claimed price premium "on a percentage basis," Mr. Weir would be assuming that the "flushable" claim contributed the same percentage of total value to the prices of all Challenged Products regardless of brand, package size, and configuration.   However, there is no reason to assume, for example, that the "flushable" claim contributes the same percentage of total value to the price of (i) a ██ refill pack of 42 wipes as it does to (ii) a ██ upright dispenser containing the same count of 42 wipes (given the different nature of the products),[19] indicating that Mr. Weir's proposed calculation "on a percentage basis" also would be unreasonable to apply across all Challenged Products.   As a further illustration, assume Mr. Weir were to opine to a 5% price premium.   This would lead to a ██ price premium on the refill pack of 42 wipes and a ██ price premium on the upright dispenser containing 42 wipes.   However, given that the Challenged Claims apply to the wipes and not the packages containing the wipes, Mr. Weir's proposed percentage price premium approach would yield asserted price premiums that would not make economic sense (i.e., different packaging of the same number of wipes having different claimed price premiums associated with the same Challenged Claims).

---

[17] Weir Declaration, p. 14.   Mr. Weir did not specify which price premium measure he would use (or how he would determine which measure to use) given the facts and circumstances of this matter.

[18] *See* Ugone Declaration, p. 26.

[19] *See* Ugone Declaration, p. 37.

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

_____

11.    Mr. Weir has not explained why either of his proposed calculations is reasonable or
would yield reliable results on a Class-wide basis in light of the wide variety of retail
prices, brands, package sizes, and configurations of the Challenged Products (or how any
proposed approach would overcome these product differences).[20]

**C.    Mr. Weir Ignored Individualized Factors That Must Be Evaluated To Determine Economic Injury**

12.    Mr. Weir's proposed approaches are not capable of determining whether individual
putative Class members suffered economic injury.   His proposed determination of a
claimed price premium on a Class-wide basis ignores individualized factors that must be
evaluated to determine whether, and to what extent, putative Class members suffered
economic injury attributable to the Challenged Claims.   As discussed in my first
declaration, these individualized factors include variations in (a) reasons for purchasing
the Challenged Products; (b) knowledge, perceptions, and behavior relating to the
Challenged Claims; and (c) purchase satisfaction (and whether each individual
experienced plumbing problems), *inter alia*.

a.    Failure To Account For Diversity In Reasons For Purchase.   Mr. Weir failed to
acknowledge that evaluating individual reasons for purchase is essential to
determining whether a putative Class member suffered injury and if so, the extent of
the injury.

i.    Mr. Weir's proposed approaches do not address the fact that consumers who
purchased Challenged Products for reasons unrelated to the Challenged Claims
(e.g., ████████████  moistness and drying, ██████ ████████ █████
████ brand name, etc.) suffered no economic loss.   In economic terms, those
consumers received the value that was paid for and were not harmed by the
Challenged Claims.

_____

[20]  Calculating a claimed price premium "on a per-wipe basis" would not alleviate these problems because there is
no reason to assume that retail prices per wipe are proportional across package sizes or that the "flushable" claim
would command the same dollar amount or percentage amount of value on a per-wipe basis given the wide variety
of retail prices (even on a per-wipe basis) and package configurations.   (*See* Ugone Declaration, pp. 38 – 39.)   For
example, calculating a claimed price premium as a percentage of per-wipe prices would not alleviate the problem
identified in the example provided above in ¶10(b).

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

---

    ii. Mr. Weir's proposed approaches do not address the fact that even for those purchasers who may have experienced harm as a result of the Challenged Claims, the injuries across this group would not be uniform given variations in consumer purchase considerations and the varying weight placed upon the Challenged Claims relative to other product attributes.[21]

    b. <u>Failure To Account For Knowledge, Perceptions, And Behavior Relating To Challenged Claims</u>.  Mr. Weir failed to acknowledge that individual inquiry is required to evaluate putative Class members' knowledge, perceptions, and actual behavior relating to the Challenged Claims, including how (if at all) the Challenged Claims affected each individual putative Class member's decision to purchase (and whether to flush) the Challenged Products.

    c. <u>Failure To Account For Variations In Purchase Satisfaction</u>.  Mr. Weir failed to acknowledge that any determination of damages absent individualized analyses of putative Class members' satisfaction with their purchases of the Challenged Products, and whether they experienced plumbing problems attributable to the Challenged Products, would result in a windfall gain to putative Class members who actually suffered no injury (i.e., who were satisfied with their purchases of the Challenged Products and did not experience plumbing problems).

13. Given the diversity of (a) reasons for purchase, (b) knowledge, perceptions, and behavior relating to the Challenged Claims, and (c) purchase satisfaction, Mr. Weir's proposed approaches (i.e., attempting to calculate a claimed price premium on a Class-wide basis) would not yield a reliable determination of whether or to what extent putative Class members suffered economic injury as a result of the Challenged Claims.

**D. <u>Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Ignores Significant Variations In Purchase Prices</u>**

14. Putative Class members purchased the Challenged Products at a wide range of retail prices, in various sales channels, at various retailers within each sales channel, in various geographic locations, at times when promotional pricing may or may not have been offered (as opposed to purchasing at everyday prices), and over the course of a Class

---

[21] For example, if two purchasers bought Cottonelle Flushable Cleansing Cloths, but one purchaser valued the cleaning ability and the Cottonelle brand name more than the "flushable" claim and the other purchaser valued the "flushable" claim above all else, the former putative Class member received greater benefits unrelated to the Challenged Claims than the latter putative Class member.  Mr. Weir's proposed approaches are not capable of differentiating these likely situations across putative Class members.

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

period that spans several years.[22]  The wide range of retail prices paid by putative Class members leads to the necessity of individualized inquiry to evaluate claimed pricing premiums (if any) that may have been paid associated with the Challenged Claims.

15.   Mr. Weir has not offered any proposed methodology that could reliably and accurately determine a claimed price premium applicable to all purchases of the Challenged Products by all putative Class members during the Class period.  Mr. Weir's proposed approaches likely would yield (a) the same price premium *amount* to be applied to every *unit* of Challenged Products sold or (b) the same price premium *percentage* to be applied to every *dollar* sold "on a Class-wide" basis.[23]  His assumption of the same price premium or percentage price premium for every Challenged Product sold does not appropriately account for the large degree of variation in prices paid for Challenged Products.  For example, there is no reason to assume that a putative Class member who purchased a Challenged Product at a promotional price paid the same claimed price premium (as a dollar amount or as a percentage of price paid) as another putative Class member who purchased at an everyday price.

16.   Mr. Weir's suggested approaches include no mechanism for evaluating potentially different claimed price premiums (if any) associated with the Challenged Claims when the Challenged Products are purchased in different sales channels (e.g., drug stores vs. mass merchandisers), in different geographic areas, from different retailers within a sales channel, or at promotional prices, *inter alia*.[24]  For example, Mr. Weir failed to address

---

[22]   *See* Ugone Declaration, Section VII.

[23]   Weir Declaration, p. 14.

[24]   The extent to which any individual putative Class member suffered economic harm, if any, depends in part upon the price paid by that individual.   The wide variations in prices paid by individual putative Class members reflect that there are varying market conditions influencing retail prices for the Challenged Products in different geographic

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

how his proposed price premium calculation on a Class-wide basis would overcome the hurdle of potential windfall gains to consumers who purchased Challenged Products from a low-priced retailer and/or at a significant discount (with the discount potentially exceeding the claimed "price premium").

**E. Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Inappropriately Relies Upon A "Fraud On The Market" Type Theory**

17.    Mr. Weir appears to rely upon a "fraud on the market" theory in asserting that "price premium damages provide restitution to the Plaintiff Class as the difference between the market price of the Products and a measure of the market price that would exist but for the Defendants' unlawful, unfair or fraudulent business practices."[25]  However, Class-wide damages issues relating to consumer products can differ significantly from those present in securities matters, which frequently invoke "fraud on the market" damages calculations.

18.    A "fraud on the market" analysis in securities matters generally is predicated upon an efficient market premise.  It is generally assumed that new information is disseminated quickly and reflected in the market price of the security in question.  Generally, shareholders observe one market price of the security (at any moment in time) due to the national exchange nature of the security at issue.  The allegedly fraudulent misrepresentation or omission is assumed to be incorporated into this single market price,

---

locations and in different sales channels, *inter alia*.  Examples of these varying market conditions include differences in consumer preferences, retailer characteristics, and competitive pressures across geographic areas and sales channels, as well as differences in promotional activities or coupon discounts, among other factors.   These varying market conditions influence the extent to which the Challenged Claims may contribute to any claimed price premium for a Challenged Product paid by an individual putative Class member.   Under these varied conditions, to determine the actual price paid by any particular putative Class member (and whether there was any price premium paid that was associated with the Challenged Claims) would require consideration of circumstances particular to that transaction.

[25]  Weir Declaration, p. 6.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

_____

as is the asserted corrective disclosure, and most shareholders (in many cases) are asserted to have been impacted equally on a per-share basis.

19.    In contrast, in a consumer product-related case, a different set of dynamics often is present.  Consumers may purchase a Challenged Product and derive value for many different reasons (e.g., in this case, ███████████ moistness and drying, ███████ ████████ ████████ ████████ brand name, etc.).  Even with the same allegedly misleading labeling, the impact of the Challenged Claim(s) on putative Class members may be different for a number of reasons.   In addition, instead of one market price (as in the case of a security), the retail prices of a consumer product vary by sales channel, retailer, geographic area, timing, whether promotional discounts are applied, and package size – leading to the necessity of individualized inquiry.   Whereas Mr. Weir proposed to identify "the difference between *the market price of the Products* and a measure of *the market price that would exist* but for the Defendants' unlawful, unfair or fraudulent business practices,"[26] there is no single "market price of the Products," and there is no single "market price that would exist" in the absence of the alleged wrongful conduct that can be measured on a Class-wide basis.   Accordingly, there is no uniform "fraud on the market" that can be measured reliably on a Class-wide basis.

**IV.    PROPOSED PRICE PREMIUM APPROACH: MR. WEIR OFFERED ONLY A GENERALIZED AND INCOMPLETE DESCRIPTION OF HIS PROPOSED HEDONIC REGRESSION ANALYSIS**

20.    Mr. Weir offered only a generalized and incomplete description of his proposed hedonic regression analysis.  He did not identify several apparent impediments associated with implementing his proposed analysis, let alone explain how he would overcome those

_____

[26] Weir Declaration, p. 6.   (Emphasis added.)

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

impediments. Hence, Mr. Weir has proposed an approach without providing adequate assurances (or sufficient detail) that his proposed approach could be reliably undertaken or that it would provide reliable or relevant results in this matter.

### A. Mr. Weir Failed To Fully Define His Proposed Regression Model

21. Mr. Weir provided a generalized and incomplete description of his proposed regression model with a "preliminary" and non-exhaustive list of only five explanatory variables and no clear identification (much less an exhaustive list) of comparator products that he would include in his proposed analysis.[27] He did not provide a functioning model (or even a preliminary model) tailored to the product market and/or specific products at issue in this matter. While hedonic regression analysis can be used in economics (and elsewhere) under certain circumstances when appropriate, it is important to note that this methodology:

a. is not without its limitations;

b. must be translated into an appropriate and theoretically correct model;

c. must be appropriately applied and implemented;

d. requires appropriate data to answer the question to which it is being applied; and

e. cannot be mechanically applied to answer any question that may be posed by an economist.

Identifying hedonic regression as a theoretical methodological tool is not enough. Answering a specific question (such as the price premium attributable to a specific Challenged Claim) requires an appropriate model and data that may or may not exist for a particular set of products.

---

[27] Weir Declaration, pp. 10 – 11.

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

22.    In this matter, within Mr. Weir's proposed framework, Mr. Weir must identify (but has not fully identified) (a) the set of Challenged Products and comparator products with and without the Challenged Claims that he would include in his regression and (b) the list of explanatory variables that he plans to use to control for all product characteristics and factors other than the Challenged Claims that potentially affect product prices.   Mr. Weir did not make an attempt to provide an exhaustive (or even preliminary) list of comparator products or an exhaustive list of explanatory variables that he would include in his proposed regression analysis.   Without knowing this information, Mr. Weir cannot provide assurances that appropriate comparator products and the relevant data required to perform his proposed regression analysis even exist, let alone that his proposed regression model will be workable and yield a reliable result.

23.    Mr. Weir has not run a single regression relating to the Challenged Products or the Challenged Claims.[28]   Absent (a) a complete model with sample regressions or (b) a sufficiently developed preliminary model, Mr. Weir cannot provide assurances that his proposed regression approach will yield a reliable result.

**B.   Mr. Weir Failed To Identify The Comparator Products He Would Use, Let Alone Comparator Products Without A "Flushable" Claim**

24.    In order for Mr. Weir's proposed hedonic regression to measure a claimed price impact associated with the "flushable" Challenged Claim,[29] Mr. Weir would have to include in his proposed regression (a) Challenged Products that at some point in time were sold without the "flushable" claim or (b) comparator products that do not have a "flushable"

---

[28]   Mr. Weir did not provide any sample regressions despite the fact that IRI/Nielsen and other sales data were available to him prior to the issuance of his declaration.   (*See* Weir Declaration, pp. 12 – 13.)

[29]   As noted previously, Mr. Weir appears to assume that he can conflate the "flushable" claim and other Challenged Claims for purposes of his analysis.   For ease of reference, I refer to the "flushable" Challenged Claim in this section of my declaration.   However, the same issues arise with regard to the other Challenged Claims.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

claim.[30]   However, Mr. Weir has not identified which comparator products he would use, let alone comparator products that are not marketed as "flushable."

a.  The Challenged Products Have Not Been Sold Without The "Flushable" Claim.   It is my understanding that there are not (and there have not been) products on the market that are otherwise identical to the Challenged Products but without the Challenged Claims.   In particular, the Challenged Products have not been sold without the "flushable" claim, and there are no wipes products offered under the Cottonelle or Scott brands that are not marketed as "flushable."[31]

b.  The "Primary Brand Name Competitors" Identified By Mr. Weir All Are Marketed As Flushable.   Although Mr. Weir did not explicitly identify the comparator products he would include in his proposed regression analysis, he did state that "Defendants have [] identified their primary brand name competitors to be Charmin Freshmates, Scotts [sic] and Cottonelle."[32]   However, Cottonelle and Scott brand wipes are among Kimberly-Clark's Challenged Products and (as mentioned above) have not been sold without the "flushable" claim.[33]   Charmin Freshmates also are marketed as "flushable."[34]   Hence, Mr. Weir failed to identify in his declaration any comparator products without a "flushable" claim.

25.   Mr. Weir's proposed regression analysis will not be capable of measuring a claimed price impact (reliably or otherwise) associated with the Challenged Claims if Mr. Weir is not able to identify and include in his proposed regression appropriate comparator products that do not have a "flushable" claim.   However, Mr. Weir did not identify in his declaration a single product without a "flushable" claim that he would include in his proposed regression.   Hence, Mr. Weir has not provided enough information to determine that his proposed regression analysis would yield a result at all concerning an

---

[30]  Mr. Weir opined that "[h]edonic regression appears to be an ideal technique for calculating the price difference between the value of the Products with and without the 'flushable' claim."   (Weir Declaration, p. 10.   (Emphasis added.))

[31]  See O'Connor Deposition, pp. 29 – 30 and 50 – 51.

[32]  Weir Declaration, p. 11.

[33]  See O'Connor Deposition, pp. 29 – 30 and 50 – 51.

[34]  See, e.g., "Charmin Freshmates," Charmin.com.   (http://www.charmin.com/freshmates-flushable-wipes.aspx, viewed on March 25, 2015.)

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

impact of the "flushable" claim on product prices, let alone that such a result would provide a reliable or relevant measure of claimed damages on a Class-wide basis.

26.   Moreover, because of the lack of comparable wipes products without a "flushable" claim sold under the same brands (e.g., Cottonelle and Scott), <u>Mr. Weir cannot calculate price premium(s) specific to the Challenged Products</u>, even if he were able to identify other comparator products not marketed as flushable.   At best, if Mr. Weir can identify other branded comparator products with and without the "flushable" claim, his calculated value would represent an average price premium <u>across those other products</u>, and he could only <u>assume</u> that the same value holds for the Challenged Products.[35]   However, there is no economic reason or support for Mr. Weir to assume that the impact of a "flushable" claim on the price of a Cottonelle or Scott brand product would be identical to the impact of a "flushable" claim on the price of other branded products.   Rather, considerations unique to each brand, such as brand name recognition, consumer loyalty, marketing, and packaging, *inter alia*, may result in disparate impacts from the products' respective "flushable" claims.   This is especially true given that consumers may be aware that there are differences in the flushability of wipes sold under different brands.[36]

---

[35] Even if Mr. Weir were able to identify an appropriate comparator product without a "flushable" claim, it may not be possible for his proposed regression analysis to separate out the impact (if any) of the "flushable" claim from the effects of the various brand names that would be included in his regression model.   To do so, Mr. Weir would need to identify a brand that offers appropriate comparator products both <u>with</u> and <u>without</u> a "flushable" claim (if such a brand exists).   Even then, Mr. Weir's proposed analysis still would not yield an estimated price premium specific to the Challenged Products.   Rather, at best, his calculated value would represent an average price premium for a "flushable" claim as estimated <u>across those other products</u>.

[36] For example, Consumer Reports tested the flushability of various brands of flushable wipes and concluded that Cottonelle and Scott products are "less likely to cause plumbing problems" than Charmin Freshmates and private label flushable wipes.   (http://www.consumerreports.org/cro/news/2013/12/think-twice-about-flushing-wet-wipes/index.htm, viewed on March 5, 2015.)

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

_____

### C. Mr. Weir Provided An Incomplete List Of Explanatory Variables

27.    Mr. Weir provided a "preliminary" list of five explanatory variables for his proposed regression analysis, including (a) the "flushable" claim; (b) brand; (c) package count/size; (d) tub vs. refill pack; and (e) "No Alcohol."[37]   This "preliminary" list of explanatory variables Mr. Weir provided lacks important details concerning how he would implement those variables, and is missing important purchase drivers and other determinants of retail prices of the Challenged Products.

   a.    No Implementation Details Regarding "Preliminary" List Of Variables.  Mr. Weir did not provide any explanation of how each of the proposed variables in his "preliminary" list of explanatory variables would be modeled in his regression analysis.   For example, he did not state whether he would model each different brand as having a distinct impact on price or only distinguish between branded and private label products.   In addition, he did not state whether his "tub vs. refill pack" variable would distinguish between a "tub" and an "upright dispenser," which may command a different retail value.

   b.    Missing Important Purchase Drivers For The Challenged Products.  Mr. Weir also failed to consider numerous other product attributes and variables that are likely to affect product prices, including the following purchase drivers discussed in my previous declaration:

   i. 

   ii. 

   iii. 

   iv. 

   v. 

   vi.  moistness and drying;

   vii. fragrance; and

   viii. marketing and advertising efforts.[38]

_____

[37] Weir Declaration, pp. 10 – 11.

[38] See Ugone Declaration, Section VI.A.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

Mr. Weir did not address the above important purchase drivers for the Challenged Products, let alone explain how each of these factors would be modeled (or implemented) within his proposed regression analysis.

c. <u>Failure To Account For Important Determinants Of Retail Prices</u>.  Retail prices of the Challenged Products vary substantially by sales channel, retailer, geographic area, use of promotions, and time of purchase, *inter alia*.[39]  However, Mr. Weir did not include any of these determinants of retail prices in his "preliminary" list of explanatory variables.

d. <u>Failure To Account For Introduction Of Competitor Products</u>.  Although Mr. Weir acknowledged that Costco introduced its flushable wipes products in July 2011,[40] Mr. Weir did not discuss how (if at all) he would account for the impact of Costco's product introduction (as a new competitor) on prices of Kimberly-Clark's Challenged Products after July 2011.  By extension, Mr. Weir has not discussed the introduction dates of any of the Challenged Products or as-yet-unidentified comparator products, or how their introductions would have impacted existing product prices.

e. <u>Failure To Provide Economic Theory To Support Selection Of Explanatory Variables</u>.  Mr. Weir stated that "making a *final* determination of the explanatory variables for use in the model would be premature" at this stage.[41]  However, Mr. Weir has not even undertaken what he described as the first step in determining the explanatory variables he would use.  Mr. Weir stated that "the identification of explanatory variables is an ongoing process that *starts with economic theory* …"[42]  However, Mr. Weir has not provided a discussion of the economic theory supporting his "preliminary" selection of explanatory variables or explaining why he omitted numerous important purchase drivers and other determinants of retail prices of the Challenged Products (as discussed above).[43]

---

[39] *See* Ugone Declaration, Section VII.

[40] Weir Declaration, p. 5.

[41] Weir Declaration, p. 11.    (Emphasis added.)

[42] Weir Declaration, p. 11.    (Emphasis added.)

[43] Mr. Weir stated that "[t]he hedonic regression function can be expressed as: $P_i(Z) = P_i(Z_1, Z_2, … Z_n)$" wherein "each Z factor is a product attribute variable."   (Weir Declaration, p. 8.)   However, "$Z_1, Z_2, … Z_n$" is not helpful to the Court in determining whether Mr. Weir's proposed analysis can reliably evaluate claimed damages on a Class-wide basis using common proof.   Without further description of Mr. Weir's decision process for including or excluding variables, the results of Mr. Weir's proposed regression analysis (should he ultimately provide any) must be interpreted with caution.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

### D. **Mr. Weir Failed To Establish The Availability Of Necessary Data**

28.    Mr. Weir stated that "[t]he data necessary to conduct a hedonic regression analysis and damage calculation in this litigation are available."[44]    However, Mr. Weir has not even provided an exhaustive list of the explanatory variables he would include in his proposed regression analysis.    Hence, it is not possible for Mr. Weir to have determined one way or the other whether the data he will need for his analysis are available.

29.    Mr. Weir's proposed regression model must control for numerous factors affecting retail prices of the Challenged Products and comparator products, many of which Mr. Weir does not appear to have considered in his declaration.    He has not established that the data necessary to control for these factors is available or would exhibit sufficient variation for his proposed analysis.    In particular, Mr. Weir failed to demonstrate the availability of data relating to at least the following factors.

   a.    Mr. Weir Failed To Demonstrate The Availability Of Historical Data Related To Labeling Claims.    Mr. Weir did not explain how he would obtain historical information regarding the various claims (including Challenged Claims and non-challenged claims) that may have affected retail prices and were included on the labels of each of the Challenged Products and each of the comparator products, including any labeling changes that may have occurred during the putative Class period.    Even if Mr. Weir were able to obtain current labels relating to the as-yet-unidentified comparator products, Mr. Weir likely would not be able to obtain labels on such products going back to the beginning of the putative Class period in 2008.

   b.    Mr. Weir Failed To Demonstrate The Availability Of Data Regarding Additional Variables That He May Consider.    Mr. Weir provided only a preliminary list of explanatory variables for use in his proposed regression analysis, stating that "it may be discovered that an additional attribute should be considered for inclusion in the model."[45]    Given that Mr. Weir has not yet determined the full set of explanatory variables that will be included in his proposed regression model, it is not possible for

---

[44] Weir Declaration, p. 12.    As an additional observation, although Mr. Weir stated that he was "provided with myriad sales data," he did not state whether he even had looked at the data he received.

[45] Weir Declaration, p. 11.

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

Mr. Weir to provide assurances that "the data necessary to conduct a hedonic regression analysis and damage calculation in this litigation are available."[46]

c.   Mr. Weir Failed To Demonstrate The Availability Of Data Regarding Advertising Expenditures.   Advertising expenditures by Kimberly-Clark and various companies that market comparator products may impact retail sales and pricing of the Challenged Products and comparator products.   However, Mr. Weir does not appear to have considered in his declaration whether advertising expenditures should be included in his proposed regression model (and if so, whether data concerning such expenditures is available).   If Mr. Weir is able to obtain advertising expenditure data at all for the various companies that market the products (especially comparator products), such data may only be available annually and/or on a company-wide basis. Without monthly (or weekly) data concerning advertising expenditures, Mr. Weir would not be able to reliably isolate the effect of increased advertising on monthly (or weekly) product prices.

d.   Mr. Weir Failed To Demonstrate The Availability Of Cost Data.   Mr. Weir does not appear to have considered in his declaration whether the costs of production and distribution for the various Challenged Products should be included in his proposed regression model, and if so, whether data concerning such costs is available (or would be available for historical periods).   Mr. Weir did not address in his declaration the possibility that different technologies may be used in different flushable wipes products (especially those marketed by different manufacturers), whether such manufacturers may have incurred varying costs of development or manufacturing, and whether such differences might influence product prices (and therefore price premiums).

**E.   Mr. Weir Failed To Explain How He Would Account For (Or Reconcile) Different Results Concerning A Claimed Price Premium**

30.   Mr. Weir failed to acknowledge that the price impact (if any) of the Challenged Claims might vary for different groups of putative Class members (e.g., individuals in different geographic areas or homeowner vs. renter status).   For example, the effect of a Challenged Claim on prices in one geographic area might not be the same as its effect on prices in another area (e.g., if consumers in certain areas are less likely to flush wipes). Without accounting for this possibility, Mr. Weir's proposed regression approach would yield a result that by construction would be uniform across geographic areas (and across

---

[46] Weir Declaration, p. 12.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

putative Class members who purchased in different areas), *inter alia*, even if the impact of the Challenged Claims on prices actually varies substantially across locations and other purchase attributes.[47]

31.    Mr. Weir asserted that his proposed calculations "can be performed on a Class-wide basis, across specific geographies, and for any defined time period …"[48]    However, Mr. Weir did not explain how he would reconcile (or even treat) differences in the claimed price premiums that likely would result from his analyses of different geographies or time periods (including the possibility that his proposed approach may yield no claimed price premium for some geographies or time periods).    For example, if Mr. Weir calculated a claimed nationwide price premium and separately calculated a claimed price premium specific to New York or New Jersey (based upon the proposed Class definitions), it is likely that those calculations would yield different results.    Such differing results may require recalculating the claimed nationwide price premium with the New York and New Jersey data removed from the nationwide data.    Mr. Weir has not contemplated this possibility or described how he would undertake such an analysis.    Such a result also would suggest that a nationwide figure (or adjusted nationwide figure) would not be reliable to apply to other states as well, given the likely variation in claimed price premiums that might arise if Mr. Weir were to calculate separate price premiums specific to each state.    (In other words, applying a claimed nationwide price premium would overcompensate some putative Class members and undercompensate others.)

---

[47] The same would be true of differences across retailers and other differences between putative Class members' purchases.

[48] Weir Declaration, p. 14.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

_____

**F.  Mr. Weir Provided No Method For Allocating Claimed Damages To Putative Class Members Without Individualized Inquiry**

32.   According to Mr. Weir, he would perform a "simple" and "straightforward" calculation of multiplying a constant premium (obtained from the proposed regression) by the sales of Challenged Products to yield a total claimed damages amount.   Importantly, Mr. Weir did not provide any methodology of allocating the total claimed damages to individual Class members.   Awarding a claimed price premium "on a dollar basis" requires information on the quantity of Challenged Products each putative Class member purchased – information that most likely is not available.   Awarding a claimed price premium "on a percentage basis" requires even greater information from each putative Class member (i.e., both the purchase price and quantity of Challenged Products each putative Class member purchased).   Mr. Weir did not address the complications associated with allocating the total claimed damages to individual Class members.   In addition, to the extent that Mr. Weir may attempt to determine different claimed price premiums across the various factors affecting retail prices (and consequently any claimed price premiums) discussed throughout my first declaration, information also would be required regarding each individual consumer's particular products purchased, sales channel, retailer, geographic location, and promotional discounts applicable to each purchase of the Challenged Products.

**V.    PROPOSED PRICE PREMIUM APPROACH: MR. WEIR'S REVIEW OF HEDONIC REGRESSION ANALYSES USED IN OTHER STUDIES DOES NOT PROVIDE ASSURANCES THAT HIS PROPOSED ANALYSIS IS WORKABLE IN THIS MATTER**

33.   Mr. Weir stated that "[h]edonic regression is routinely used to calculate the value of individual product attributes" and provided a "review of sample literature" relating to

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

hedonic regression. However, the fact that hedonic regression has been implemented in other studies <u>unrelated</u> to the Challenged Products, the Challenged Claims, or the facts and circumstances at issue in this matter does not provide assurances that Mr. Weir would be able to implement his proposed hedonic regression approach in this case.

34. Examples of studies Mr. Weir cited in his declaration are discussed below.

  a. <u>Adjustments To The Consumer Price Index</u>. Mr. Weir cited a U.S. Bureau of Labor Statistics study relating to the calculation of certain adjustments to the U.S. consumer price index ("CPI").[49] However, Mr. Weir failed to acknowledge that the CPI is not intended to identify how much a particular individual's cost of living has increased or to imply that cost of living has increased by an *identical* amount for *all* individuals living in the U.S. Rather, the CPI is an aggregate measure that may not accurately reflect changes in the cost of living for a particular individual. In other words, Mr. Weir failed to acknowledge (or even recognize) that the purpose to which hedonic regression was used in his CPI example is materially different than the purpose for which he has proposed to use hedonic regression in this dispute.

  b. <u>Labeling Of Organic Food Products</u>. Mr. Weir cited three studies relating to the labeling of various food products (i.e., yogurt, eggs, and breakfast foods) as "organic" and/or "natural" (or similar claims) and whether such labeling influenced prices.[50] However, the fact that hedonic regression analysis was implemented in those studies involving a different set of products, a different set of comparator products (e.g., with and without the "organic" claims), a different set of product attributes, and a different set of labeling claims does not imply that Mr. Weir is capable of implementing his proposed regression analysis in this matter. Nor does it imply that his proposed analysis could reliably evaluate claimed damages in this matter on a Class-wide basis using common proof.

35. As illustrated with the examples above, Mr. Weir's "review of sample literature" relating to hedonic regression analysis does not provide assurances that his proposed analysis is workable in this matter. The question at issue here is not whether hedonic regression can be an acceptable approach under certain circumstances, but rather whether it can be implemented reliably *in this case* to evaluate putative Class members' claimed damages

---

[49] Weir Declaration, p. 9.

[50] Weir Declaration, pp. 9 – 10.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

on a Class-wide basis using common proof. As discussed throughout this rebuttal declaration, Mr. Weir provided only a generalized and incomplete description of his proposed hedonic regression analysis and failed to address numerous complexities that inevitably would arise if he were to attempt to implement his proposed analysis. Accordingly, Mr. Weir has not demonstrated that a hedonic regression analysis could be used in this case to measure claimed damages reliably on a Class-wide basis using common proof.

## VI.   PROPOSED PRICE PREMIUM APPROACH: MR. WEIR FAILED TO EXPLAIN HOW HE WOULD OVERCOME COMMON DRAWBACKS TO HIS PROPOSED SURVEY APPROACHES

36.   As an alternative to his proposed hedonic regression approach, Mr. Weir asserted – in a footnote – that he could calculate claimed price premium damages using "statistical survey techniques" such as contingent valuation or conjoint analysis.[51]   However, Mr. Weir did not present sufficient information concerning these proposed survey approaches to provide appropriate assurances that they could be implemented in this matter.   Mr. Weir provided only a brief and generalized description of contingent valuation and conjoint analysis with no details concerning how he would implement those proposed approaches in this matter.   In particular, Mr. Weir provided no details concerning:

a.   which product attributes would be tested in the proposed surveys;

b.   how those product attributes would be represented to participants in the surveys; and

c.   how those product characteristics would be varied (if at all) across the set of questions or choices presented to participants.

37.   In addition, Mr. Weir's brief and incomplete descriptions of his proposed contingent valuation and conjoint analysis approaches overlook many common drawbacks and

---

[51] Weir Declaration, p. 6, n. 14.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

known challenges in performing such analyses, including at least the following potential flaws that Mr. Weir failed to acknowledge, let alone explain how he would overcome.

    a.  Mr. Weir's proposed survey approaches, at best, would measure an average <u>willingness to pay</u>, not an actual price premium paid.  As explained below, an estimate of consumers' "willingness to pay" does not provide a reliable measure of actual price premiums paid (if any) in the marketplace.

    b.  Mr. Weir's proposed survey approaches would draw attention to features that may not be considered (or only would be considered to a lesser degree) by consumers when making actual purchase decisions.

    c.  Mr. Weir's proposed survey approaches cannot provide a historical value for the Challenged Claims tied to the putative Class period (which extends over a number of years).

38.    From an economic and claimed damages perspective, in light of these drawbacks associated with Mr. Weir's proposed survey approaches and because Mr. Weir has not offered sufficient details concerning his proposed surveys, offered any pilot surveys or sample survey questions, conducted any pretesting related to his proposed surveys, or provided any fully developed economic models for evaluation, there can be no assurances that Mr. Weir's proposed survey approaches could reliably isolate a claimed "willingness to pay" for the Challenged Claims, let alone an actual price premium paid.

### A.  <u>Mr. Weir's Proposed Survey Approaches At Best Would Measure An Average Willingness To Pay, Not An Actual Price Premium Paid</u>

39.    Mr. Weir's proposed survey approaches, at best, would measure his survey participants' average "willingness to pay" for the Challenged Claims, not an actual <u>price premium</u> paid.  As acknowledged by Mr. Weir, contingent valuation "asks people to directly report their *willingness to pay* to obtain a specified good or product attribute."[52] Similarly, conjoint analysis often is used to ascertain an average "willingness to pay" for

---

[52]  Weir Declaration, p. 6.   (Emphasis added.)

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

a product or feature among survey participants.[53]  With respect to his proposed survey approaches, Mr. Weir failed to acknowledge the distinction between two fundamentally different economic concepts: (a) the amount a consumer might hypothetically be *willing to pay* for a product or feature and (b) the actual price charged for the product or feature in the marketplace.  Basic economic theory dictates that price is determined by the interaction between supply and demand factors.  A consumer's "willingness to pay" for a product or feature does not, alone and without other input, determine observed prices or price premiums.  The difference between a consumer's willingness to pay and the actual price paid is called "consumer surplus" – a universally accepted economic distinction.[54]  Generally, the market price of a product is lower than all but the marginal purchaser's willingness to pay – providing incentives to purchase the product for those consumers with a *higher* willingness to pay (because the actual price they pay is less than the value they place upon the product).[55]  Mr. Weir provided no methodology that would allow him to convert a "willingness to pay" figure (potentially derived from his proposed survey approaches) into a claimed price premium (if any) that actually occurred in the marketplace.

---

[53]  *See*, *e.g.*, "Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions," Sawtooth Software Research Paper, 2001.  (http://www.sawtoothsoftware.com/downloadPDF.php?file=monetary.pdf, viewed on March 24, 2015.)  As discussed in the above-mentioned paper, common forms of conjoint analysis yield an array of "utility levels" associated with various product attributes wherein "[t]he worths of levels are estimated on an arbitrary interval scale" and "the absolute magnitudes of utilities have no meaning."  According to the paper, "[o]ne common attempt to make conjoint utilities more understandable is to convert them to monetary or 'dollar equivalents,'" but this "usually turns out to be a poor use of conjoint data," and "even after taking the appropriate steps to compute reasonable dollar equivalents, the results are potentially misleading."  Further, "an examination of average values will often suggest that respondents are willing to pay much more for one feature over another than is suggested by market prices."  (Emphasis added.)

[54]  *See*, *e.g.*, Jeffrey M. Perloff, Microeconomics (5th Edition), p. 272.

[55]  Market conditions ultimately determine the price of a product.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

40.    Willingness to pay may have little or no systematic relationship with the prices actually charged by retailers and paid by consumers.   The prices actually charged by retailers and paid by consumers depend upon a combination of demand and supply factors (in addition to consumer preferences and hypothetical perceptions of value for a particular feature). Other economic factors that might influence prices (and therefore price premiums) include:

   a.   the value of other features or attributes provided in the same product (including features or attributes not tested in the proposed survey);

   b.   features and prices of other products that consumers might choose as alternatives;

   c.   costs of production and distribution;

   d.   practical pricing considerations, including interactions with other products that may be offered by the same manufacturer; and/or

   e.   other strategic considerations that can affect the pricing decisions of manufacturers and retailers (including the pricing associated with competing products).

41.    Mr. Weir's proposed survey approaches would measure only a hypothetical willingness to pay even if performed in a manner that avoids the many potential biases and uncertainties involved in designing and implementing consumer surveys of this type. Mr. Weir's proposed analysis fails to take into account supply considerations and/or other market forces that may be present.   Various flushable wipes products are sold with a variety of attributes and by a variety of competitors.   In this context, there may be no nexus between (a) some consumers' hypothetical willingness to pay for a given attribute of a multi-featured product and (b) a manufacturer's or retailer's ability to charge an actual price premium or the market's actual placement of a price premium on that specific product attribute.   Hence, any claimed "willingness to pay" derived by Mr. Weir from a conjoint analysis or contingent valuation approach is likely to have little or no

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

correlation with any <u>actual</u> premium observed in the market associated with the Challenged Claims.

**B.** <u>**Proposed Survey Approaches Draw Attention To Features That May Not Be Considered By Customers When Making Actual Purchase Decisions**</u>

42.     Mr. Weir's proposed survey approaches would draw attention to the features used in the survey exercise (e.g., the Challenged Claims) at the expense of features not included in the survey. A survey necessarily places emphasis on product attributes that consumers may or may not place emphasis on while shopping. In a store environment (when an actual purchase is being considered), the consumer *chooses* the product attributes upon which to focus; in a survey environment, the consumer *is told* the product attributes upon which to focus. By drawing additional attention to the Challenged Claims, Mr. Weir's proposed survey approaches run the risk of assigning a larger value to the tested feature(s) than that which actually would be observed in the marketplace. Presented with a description of the Challenged Claims in a survey, respondents may ascribe more value to the Challenged Claims than they would when making actual purchase decisions. Mr. Weir did not address how, or if, he would overcome this drawback.

**C.** <u>**Proposed Survey Approaches Cannot Provide A Value Tied To The Putative Class Period**</u>

43.     Survey techniques such as conjoint analysis or contingent valuation generally measure the value of product attributes at the point in time of the survey and cannot easily determine the value of attributes in the past. Hence, any average willingness to pay that Mr. Weir might calculate through his proposed survey approaches would be based upon tastes and preferences that exist at the time his proposed survey is performed (i.e., at some time in the future). However, the putative Class period began more than seven

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

years ago in February 2008.[56]   A conjoint analysis or contingent valuation survey conducted today cannot account reliably for changing preferences for the Challenged Claims over the entire Class period (or changing degrees of competition across various products over the entire Class period that might affect responses).[57]   Hence, there are no assurances that the average willingness to pay that Mr. Weir proposes to calculate at some point in the future would be representative of (or correlated with) putative Class members' willingness to pay associated with the Challenged Claims (let alone an actual price premium paid, if any existed) several years prior to Mr. Weir's proposed survey.[58]

## VII.   MR. WEIR'S PROPOSED FULL REFUND APPROACH DOES NOT YIELD A RELIABLE OR RELEVANT MEASURE OF CLAIMED DAMAGES ON A CLASS-WIDE BASIS

44.    Mr. Weir described "Full Compensatory Damages" as a calculation "wherein consumers would receive a full refund for their purchases of the Products."[59]   However, Mr. Weir's proposed full refund approach does not provide a reliable or relevant measure of the

---

[56]   *See* Weir Declaration, p. 5.

[57]   Mr. Weir also failed to address the possibility that the results of a conjoint analysis or contingent valuation survey conducted today may be influenced by the allegations at issue in this matter and/or media reports such as those cited in the Complaint, to the extent that survey participants are aware of such allegations and media reports.   A survey conducted today may yield a different alleged value associated with the Challenged Claims than one conducted up to seven years ago when there were no allegations of clogged pipes or non-flushability.   Mr. Weir did not explain how he would handle this potential bias in the results of his proposed survey.   For example, Mr. Weir did not state whether he would include a pre-screening question to determine whether each participant is aware of allegations that flushable wipes may cause plumbing problems.   Even if Mr. Weir were to include such a question, doing so would alert other participants to the potential issue, such that all participants' responses may be influenced by allegations of non-flushability.   For these reasons, among others, the results of Mr. Weir's proposed survey are not likely to be representative of the value that putative Class members may have placed on the Challenged Claims over the duration of the putative Class period (i.e., up to seven years in the past).

[58]   In addition, Mr. Weir has not addressed whether and/or how he would ensure that the sample of respondents for his proposed surveys would be appropriately representative of the nationwide putative Class, which comprises members who reside in 50 different states, who are likely to shop in a variety of different sales channels and at a variety of retailers, and who are likely to have a variety of reasons for purchasing the Challenged Products.

[59]   Weir Declaration, p. 5.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

_____

alleged harm suffered by putative Class members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.

**A.  No Adjustment For Value Received By Consumers**

45.   The "full refund" approach proposed by Mr. Weir does not appropriately take into account the value received by each putative Class member from the purchase and use of the Challenged Products.   Accurately assessing economic injury suffered by a consumer purchasing the Challenged Products requires that Mr. Weir deduct from the purchase price the value actually received by the consumer, which may depend upon the individual's reasons for purchasing the Challenged Products and purchase satisfaction, among other considerations.   As discussed in my previous declaration, consumers have expressed satisfaction with many different attributes of the Challenged Products (e.g., ███████ moistness, ███████████████████ ████████ and the dispenser) other than the Challenged Claims.[60]  The Challenged Claims relate only to disposal of the products after they have been used and these benefits have been received.   Hence, from an economic perspective, putative Class members received some value from purchasing and using the Challenged Products.   Mr. Weir's proposed "full refund" approach does not account for that value received by putative Class members.

**B.  Provides A Refund To Consumers Who Suffered No Economic Injury**

46.   Mr. Weir's proposed "full refund" approach ignores individualized factors that must be evaluated to determine economic injury.   As discussed in my previous declaration, determining whether a putative Class member suffered economic injury as a result of the

_____

[60] *See* Ugone Declaration, Section VI.A.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

Challenged Claims requires individualized information specific to each Class member, including but not limited to:

a.  reasons for purchase (and whether the Challenged Claims influenced each individual's purchase decision);

b.  knowledge, perceptions, and behavior relating to the Challenged Claims;

c.  purchase satisfaction; and

d.  whether each individual experienced plumbing problems associated with the Challenged Products.

47.  Mr. Weir's proposed "full refund" approach ignores the individualized factors identified above and consequently would result in a windfall gain to individuals who actually suffered no injury (e.g., individuals who purchased for reasons unrelated to the Challenged Claims, are satisfied with their purchases, or have not experienced plumbing problems).

**C.  Ignores Significant Variations In Retail Prices**

48.  Mr. Weir asserted that "[u]nder a damages framework awarding full recovery, class-wide damages are easily calculated by simple mathematics" by multiplying "*Average Retail Purchase Price per Unit*" times "*Number of Units Sold*."[61]  However, as discussed in detail in my previous declaration, there are significant variations in the prices paid for Challenged Products by individual putative Class members based upon a number of factors, including the particular product purchased, sales channel, retailer, geographic location, and promotional discounts applicable to each purchase of the Challenged Products.[62]  Therefore, there is no single purchase price that can be determined for all putative Class members on a Class-wide basis (or average price that accurately reflects

---

[61]  Weir Declaration, p. 5.   (Emphasis in original.)

[62]  *See* Ugone Declaration, Section VII.

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

prices paid by all putative Class members). Using an "*Average Retail Purchase Price*" as proposed by Mr. Weir would mask significant variations in the prices actually paid by putative Class members – overcompensating some members and undercompensating others.[63] Individual inquiry is required to determine the purchase price paid by each individual Class member.

### D. No Allocation Method Provided

49. Mr. Weir has not provided a mechanism for allocating to individual putative Class members the portion of the proposed "full recovery" measure associated with each individual Class member's purchase(s). In light of the variations in actual prices paid and quantities purchased by putative Class members, individualized inquiry would be required in order to allocate the proposed "full recovery" to individual putative Class members. Any type of allocation methodology divorced from actual individual purchase patterns will over-compensate some Class members and under-compensate other Class members.

## VIII. MR. WEIR'S PROPOSED STATUTORY DAMAGES APPROACH WOULD RESULT IN WINDFALL GAINS TO INDIVIDUALS WHO SUFFERED NO INJURY

50. Mr. Weir proposed to perform a "Statutory Damages" calculation "wherein consumers would be entitled to receive $50 per violation under New York General Business Law § 349."[64] Mr. Weir stated that "statutory damages would be computed by multiplying

---

[63] In addition, depending upon the data available to Mr. Weir for calculating an average retail purchase price, his calculations may not accurately reflect the total amounts paid by purchasers of the Challenged Products across all sales channels and retailers. For example, if the pricing data obtained by Mr. Weir did not include Walmart (which likely offers relatively low prices for the Challenged Products compared to other retailers), then Mr. Weir's calculation likely would overstate the overall average retail purchase prices for the Challenged Products and consequently would overstate the aggregate proposed "full recovery" measure.

[64] Weir Declaration, pp. 5 and 14. New York General Business Law § 349 states in part that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

the number of units of the Product sold in New York by $50."[65]    From an economic

perspective, Mr. Weir's proposed statutory damages calculation would result in windfall

gains to a significant number of putative Class members who were not injured as a result

of the Challenged Claims, including putative Class members who purchased the

Challenged Products for reasons unrelated to the Challenged Claims, who were satisfied

with their purchases, and/or who did not experience plumbing problems associated with

the Challenged Products, *inter alia.*    Likewise, to the extent putative Class members

experienced plumbing damages that exceeded $50, Mr. Weir's "Statutory Damages"

calculation would not account for their "actual damages" that are provided for by the

statute.

## IX.    MR. WEIR DID NOT ACCOUNT FOR ALLEGED PLUMBING DAMAGES EXPERIENCED BY PUTATIVE CLASS MEMBERS

51.    I understand that the Plaintiff in this matter is seeking plumbing expenses incurred by

putative Class members.[66]    Nonetheless, Mr. Weir's declaration did not address how

putative Class members' plumbing expenses could be assessed or measured on a Class-

wide basis using common proof.    For the reasons explained in my previous declaration,

plumbing expenses incurred by putative Class members cannot be measured on a Class-

wide basis using common proof.    Rather, individualized inquiry would be required to

determine the relevant plumbing expenses (if any) incurred by each putative Class

member from using the Challenged Products.[67]

---

act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. (*See* http://codes.lp.findlaw.com/nycode/GBS/22-A/349, viewed on March 25, 2015.)

[65] Weir Declaration, p. 14.

[66] *See, e.g.,* Complaint, p. 2 and Kurtz Deposition, p. 154.

[67] *See* Ugone Declaration, Section IX.

HIGHLY CONFIDENTIAL

Rebuttal Declaration of Keith R. Ugone, Ph.D.
March 27, 2015

* * * * * *

52.    My analyses, observations, and opinions contained in this declaration are based upon information available to date. I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.


I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Montreal, Quebec, Canada on March 27, 2015.

_Keith R. Ugone_

_____
Keith R. Ugone, Ph.D.