UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

                                 x

| | |
|---|---|
| D. JOSEPH KURTZ, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>  vs.<br><br>KIMBERLY-CLARK CORPORATION, et al.,<br><br>                Defendants. | Civil Action No. 1:14-cv-01142-JBW-RML<br><br>PLAINTIFF'S OMNIBUS REPLY MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' POST-HEARING BRIEFS, IN OPPOSITION TO THE MOTION TO STRIKE COLIN WEIR'S METHODOLOGY AND CONCLUSIONS, AND IN FURTHER SUPPORT OF PLAINTIFF D. JOSEPH KURTZ'S MOTION FOR CLASS CERTIFICATION |

                                 x

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.    ARGUMENT .........................................................................................................2

    A.    Mr. Weir's Methodology Measures Aggregate Classwide Harm, and Is Based on Common Injury ......................................................................2

    B.    Mr. Weir's Hedonic Regression Methodology Complies with Both *Daubert* and *Comcast* ..............................................................................4

        1.    Plaintiff's Damages Model Is Consistent with His Theory of Liability ..............................................................................................4

    C.    The Economic Model Utilized by Mr. Weir Is Suitable for Calculating Price Premium Damages on a Classwide Basis ......................................6

        1.    Mr. Weir's Qualifications ............................................................6

        2.    Mr. Weir Performed a Hedonic Regression Analysis to Isolate the Price Premium Associated with the "Flushable" Claim, as Used by Each Defendant, on a Classwide Basis ......................................7

        3.    Legal Standard for *Daubert* .........................................................8

        4.    Defendants Do Not Establish that Mr. Weir's Hedonic Regression Analysis Fails to Satisfy the *Daubert* Test or Meet the Predominance Standard ................................................................9

            a.    Mr. Weir's Price Premium Analysis Does Not Require Individual Inquiries ......................................................11

    D.    Defendants' Criticisms of Mr. Weir's Model Do Not Warrant Decertification ......................................................................................13

        1.    Mr. Weir Incorporated the Appropriate Attributes In His Hedonic Regression Model ....................................................................13

        2.    Mr. Weir's Hedonic Regression Methodology Demonstrates Classwide Injury Throughout the Certified (and Proposed Extended) Class Periods ............................................................16

            a.    Challenges to Statistical Significance Do Not Defeat Class Certification ..............................................................18

3.      The IRI Data Collected and Then Utilized by Mr. Weir Is in Reliable Form and Supports His Economic Analysis...............................20

4.      Defendants Have Not Identified a Single, *Required*, Omitted Variable................................................................................................23

E.      Market Conditions Do Not Undermine the Reliability of Mr. Weir's Hedonic Regression Model.........................................................................27

1.      Mr. Weir's Model Does Not Suffer from Problems with Perfect Collinearity ............................................................................................27

2.      Mr. Weir's Hedonic Regression Analysis Does Not Suffer from Problems Associated with Perfect Competition .................................33

3.      "Flushable" Is a Sufficiently Distinctive Term for the Purposes of Certifying Classes and Supporting Common Injury on a Classwide Basis Analysis .........................................................................................38

a.      "Flushable" as Defined by The Association of the Nonwoven Fabrics Industry ("INDA")...........................................38

b.      "Flushable" as Defined by the FTC's Consent Order with Nice-Pak................................................................................39

c.      Defendants' Flushable Wipes Do Not Qualify as "flushable" as Defined by Robert A. Villée – the Executive Director of PARSA and Prior Chair of WEF................................40

d.      Inclusion of the "Flushable" Claim in Mr. Weir's Model Does Not Require Individualized Inquiries into Each Class Members' Understanding of the Term...........................................40

F.      The "Flushable" Claim Has Consistently Appeared on Defendants' Labels ........42

III.    CONCLUSION...............................................................................................................48

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ackerman v. Coca-Cola Co.*,
   No. 09 CV 395(DLI)(RML), 2013 WL 7044866
   (E.D.N.Y. July 28, 2018) ........................................................................................3, 41

*Algarin v. Maybelline, LLC*,
   300 F.R.D. 444 (S.D. Cal. 2014) .......................................................................................31

*Anghel v. Sebelius*,
   912 F. Supp. 2d 4 (E.D.N.Y. 2012) ...................................................................................19

*Bazemore v. Friday*,
   478 U.S. 385 (1986) ..............................................................................................13, 14

*Bickerstaff v. Vassar Coll.*,
   196 F.3d 435 (2d Cir. 1999) ...............................................................................13, 14

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) .......................................................................................9

*Brazil v. Dole Packaged Foods, LLC*,
   No. 12-CV-01831-LHK, 2014 WL 5794873
   (N.D. Cal. Nov. 6, 2014) .......................................................................................30

*Brinker Rest. Corp. v. Superior Court*,
   53 Cal. 4th 1004 (2012) .......................................................................................12

*Briseno v. ConAgra Foods, Inc.*,
   No. 15-55727, 2017 WL 53421
   (9th Cir. Jan. 3, 2017) .......................................................................................7

*Broomfield v. Craft Brew All., Inc.*,
   No. 17-cv-01027-BLF, 2018 WL 4952519
   (N.D. Cal. Sept. 25, 2018) .......................................................................................24

*Chen-Oster v. Goldman, Sachs & Co.*,
   114 F. Supp. 3d 110 (S.D.N.Y. 2015) .......................................................................................9

*Chen-Oster v. Goldman, Sachs & Co.*,
   325 F.R.D 55 (S.D.N.Y. 2018) .......................................................................................13, 14, 15

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .......................................................................................2, 4, 9, 30

Page

*Cook v. Rockwell Int'l Corp.*,
    580 F. Supp. 2d 1071 (D. Colo. 2006) ...................................................................19

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................... *passim*

*Davidson v. Kimberly-Clark Corp.*,
    889 F.3d 956 (9th Cir. 2018) .........................................................................3

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) ....................................................................12

*Dzielak v. Whirlpool Corp.*,
    No. CV 2:12-89 (KM)(JBC), 2017 WL 6513347
    (D.N.J. Dec. 20, 2017) .............................................................................11

*Hasemann v. Gerber Prods. Co.*,
    331 F.R.D. 239 (E.D.N.Y. 2019) .................................................................. *passim*

*Herron v. Best Buy Stores, LP*,
    No. 2:12-CV-02103-TLN-CKD, 2018 WL 1960659
    (E.D. Cal. Apr. 26, 2018) ..........................................................................31

*Hughes v. Ester C Co.*,
    317 F.R.D. 333 (E.D.N.Y. 2016) ................................................................38, 41

*Hughes v. Ester C Co.*,
    930 F. Supp. 2d 439 (E.D.N.Y. 2013) ...............................................................3

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    No. 11 Civ. 4209(KBF), 2013 WL 5815472
    (S.D.N.Y. Oct. 29, 2013) ..........................................................................37

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1175(JG)(VVP), 2014 WL 7882100
    (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL
    5093503 (E.D.N.Y. July 10, 2015) ..................................................................28

*In re AMLA Litig.*,
    282 F. Supp. 3d 751 (S.D.N.Y. 2017) ...............................................................21

*In re AMLA Litig.*,
    320 F. Supp. 3d 578 (S.D.N.Y. 2018) ...............................................................21

**Page**

*In re AMLA Litig.*,
   328 F.R.D. 127 (S.D.N.Y. 2018) ........................................................21

*In re ConAgra*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ........................................ *passim*

*In re Dial Complete Mktg. & Sales Practices Litig.*,
   320 F.R.D. 326 (D.N.H. 2017) ..........................................................11

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009) ........................................................37

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ............................................................28

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-cv-02509-LHK, 2014 WL 1351040
   (N.D. Cal. Apr. 4, 2015) ....................................................19, 27, 28

*In re Korean Ramen Antitrust Litig.*,
   No. 13-cv-04115-WHO, 2017 WL 235052
   (N.D. Cal. Jan. 19, 2017) ................................................................28

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-2420 YGR, 2017 WL 1391491
   (N.D. Cal. Apr. 12, 2017) ................................................................19

*In re Live Concert Antitrust Litigation*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ..............................................26

*In re NJOY Consumer Class Action Litigation*,
   120 F Supp 3d 1050 (C.D. Cal. 2015) ..............................................24

*In re NJOY, Inc. Consumer Class Action Litig.*,
   No. CV 14-428-JFW, 2016 WL 787415
   (C.D. Cal. Feb. 2, 2016) ..............................................................4, 36

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ..........................................4, 5, 7, 35

*In re Visa Check/Mastermoney Antitrust Litig.*,
   192 F.R.D. 68 (E.D.N.Y. 2000) ..........................................................9

**Page**

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001)............................................................................2

*In re Wireless Tel. Servs. Antitrust Litig.*,
  385 F. Supp. 2d 403 (S.D.N.Y. 2005)..........................................................14

*Kadas v. MCI Systemhouse Corp.*,
  255 F.3d 359 (7th Cir.2001) .........................................................................19

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
  311 F.R.D. 373 (S.D.N.Y. 2015) ....................................................................3

*Kumar v. Salov N. Am. Corp.*,
  No. 14-CV-2411-YGR, 2016 WL 3844334
  (N.D. Cal. July 15, 2016)..............................................................................35

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999).........................................................................................8

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
  No. 3:13-cv-1470 (JAM), 2017 WL 985640
  (D. Conn. Mar. 13, 2017), *rev'd on other grounds*, 897 F.3d 88 (2d Cir. 2018)................5, 44

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ....................................................................3

*McLaughlin v. American Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008).........................................................................37

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ......................................................................3

*Morales v. Kraft Foods Grp., Inc.*,
  No. LA CV14-04387 JAK (PJWx), 2017 WL 2598556
  (C.D. Cal. June 9, 2017) ............................................................................2, 12

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001)..........................................................................12

*Nimely v. City of N.Y.*,
  414 F.3d 381 (2d Cir. 2005)............................................................................8

**Page**

*Overstreet v. Virts*,
   No. 14-CV-6582P, 2019 WL 1331567
   (W.D.N.Y. Mar. 25, 2019) ................................................................................4, 9

*Perez v. Allstate Ins. Co.*,
   No. 11-CV-1812 (JFB)(AKT), 2014 WL 4635745
   (E.D.N.Y. Sept. 16, 2014) ....................................................................................2

*Pettit v. Procter & Gamble Co.*,
   No. 15-cv-02150-RS, 2017 WL 3310692
   (N.D. Cal. Aug. 3, 2017) ......................................................................35, 41, 47

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   327 F.R.D. 38 (S.D.N.Y. 2018) ..........................................................................18

*Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014) ............................................................14, 15

*Restivo v. Hessemann*,
   846 F.3d 547 (2d Cir. 2017) .................................................................................8

*Reyes v. Delta Dallas Alpha Corp.*,
   No. 92 Civ. 4418(AGS), 2000 WL 526851
   (S.D.N.Y. May 2, 2000) ........................................................................................9

*Schechner v. Whirlpool Corp.*,
   No. 2:16-cv-12409, 2019 WL 978934
   (E.D. Mich. Feb. 28, 2019) ........................................................................4, 24, 25

*Schmitt v. Younique LLC*,
   No. SACV 17-1397JVS(JDEx), 2019 WL 1431906
   (C.D. Cal. Jan. 10, 2019) ....................................................................................20

*Singleton v. Fifth Generation, Inc.*,
   No. 5:15-CV-474, 2017 WL 5001444
   (N.D.N.Y. Sept. 27, 2017) ..........................................................................4, 15, 24

*Smajlaj v. Campbell Soup Co.*,
   782 F. Supp. 2d 84 (D.N.J. 2011) ......................................................................11

*Sobel v. Yeshiva Univ.*,
   839 F.2d 18 (2d Cir. 1988) ............................................................................26, 28

**Page**

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)................................................................3

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010)...........................................................37

*Universal Surveillance Corp. v. Checkpoint Sys., Inc.*,
   No. 5:11-CV-1755, 2015 WL 6082122
   (N.D. Ohio Sept. 30, 2015) ...........................................................19

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).........................................................2, 3

*Weiner v. Snapple Beverage Corp.*,
   No. 07 Civ. 8742 (DLC), 2010 WL 3119452
   (S.D.N.Y. Aug. 5, 2010) ..................................................................9

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-CV-02724-LHK, 2014 WL 7148923
   (N.D. Cal. Dec. 15, 2014) ................................................28, 29, 30

*Zakaria v. Gerber Prods. Co.*,
   No. LA CV15-00200 JAK (Ex), 2016 WL 6662723
   (C.D. Cal. Mar. 23, 2016) ..............................................................20

**STATUTES, RULES AND REGULATIONS**

Federal Rule of Evidence
   Rule 702......................................................................................8

Federal Rules of Civil Procedure
   Rule 23....................................................................................9, 12
   Rule 23(b)(3)......................................................................2, 9, 48

New York General Business Law
   §349(h).........................................................................................3

Racketeer Influenced and Corrupt Organizations Act ...............................37

**SECONDARY AUTHORITIES**

Freeman, A. Myrick III, *Hedonic Prices*, *Property Values and Measuring
   Environmental Benefits: A Survey of the* Issues, 81 Scandinavian J. Econ. 154,
   158-64 (1979).............................................................................36

**Page**

Weinberger Decl., Palmquist, Raymond B., *Property Value Models*, 2 Handbook
of Environ. Econ. 764, 784-85 (2005) .....................................................................36

## I.      INTRODUCTION

Plaintiff Dr. D. Joseph Kurtz submits this omnibus response to defendant Kimberly-Clark's Post-Hearing Brief and Motion to Exclude Testimony of Expert Colin Weir (ECF No. 362) ("Kimberly-Clark Brf."), and defendant Costco's Post-Hearing Brief in Support of Decertifying the Class (ECF No. 358-1) ("Costco Brf.").[1]  Defendants' supplemental submissions confirmed what Plaintiff expected and anticipated:[2] that Defendants could only pose theoretical faults in Mr. Weir's work and have not identified a single fatal flaw or abuse of economic principles. Defendants' inventory of quibbling over Mr. Weir's methodology cannot defeat Plaintiff's price premium theory of damages on a classwide basis.  Nitpicking over variables,[3] for example, as posed by Defendants, has no application at the class certification stage and, at most, relates to the weight of the evidence that should be determined by a jury.  Identifying potential errors that *could*,

---

[1]   All capitalized terms and citation abbreviations referenced herein, shall have the same meaning as set forth in Plaintiff's Omnibus Memorandum of Law in Further Support of Plaintiff D. Joseph Kurtz's Motion for Class Certification and in Opposition to Defendants' Motions to Deny Class Certification, and in Support of Plaintiff's Motion to Strike the Opinions of Kimberly-Clark's Expert Witness ("Plaintiff Brf.").  All internal quotations and citations are omitted, and emphasis is added, unless otherwise noted.

[2]   Plaintiff's own supplemental briefing preemptively addressed Defendants' theoretical flaws and faults.  *See, e.g.*, Plaintiff Brf. at 23-44.

[3]   Dr. Martin: "omission from the regression ***could*** bias the coefficient" (Martin Supp. Rpt. at ¶13);" "it ***may*** be that insignificant coefficients and/or additional collinearity problems would emerge in his regression analysis" (*id*. at n.12); "***could*** be attributable to volume discounting" (*id*. at ¶23); "it is ***entirely possible*** that this difference in price for KS MTT can be explained by the fact that the product contains fewer sheets than KS Baby Wipes" (*id*. at ¶2d); Dr. Ugone: "purchase drivers discussed herein ***might*** drive purchasing behavior for some putative Class members but not for others" (Ugone Supp. Decl. at ¶29, n.64); "***likely*** would significantly reduce and ***possibly*** eliminate Mr. Weir's result" (*id*. at ¶82); "The price of wet wipes is ***likely*** impacted by various attributes that are not on the product labels" (*id*. at ¶74b).

*may* or *might* influence a methodology is not grounds to decertify the class or strike Mr. Weir's proposed methodology.

## II.     ARGUMENT

### A.     Mr. Weir's Methodology Measures Aggregate Classwide Harm, and Is Based on Common Injury

A classwide damages model need not include precise dollar amounts applied to each class member. *See Morales v. Kraft Foods Grp., Inc.*, No. LA CV14-04387 JAK (PJWx), 2017 WL 2598556, at *22 (C.D. Cal. June 9, 2017) ("*Comcast* acknowledged that "'[c]alculations need not be exact'") (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 1433 (2013) and Rule 23(b)(3)). In fact, a "class can be certified under Rule 23(b)(3) even if damages require individualized determination." *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 275-76 (E.D.N.Y. 2019) (declaring that this "remains true after the Supreme Court's decision in *Comcast*"); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (rejecting "defendants' argument that class certification was improper under *Comcast* because the plaintiffs' damages model failed to account for variations in inflation over time" because "*Comcast* does not suggest that damage calculations must be so precise" at the class certification juncture); *Perez v. Allstate Ins. Co.*, No. 11-CV-1812 (JFB)(AKT), 2014 WL 4635745, at *21 (E.D.N.Y. Sept. 16, 2014) ("neither *Comcast* nor any other binding authority holds that the need to calculate damages on an individualized basis necessarily defeats the predominance element of Rule 23(b)(3)").

An aggregate of classwide damages, as Mr. Weir proposes here, satisfies the predominance element of class certification. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001) (clarifying that the need to later calculate damages on an individual basis does not preclude class certification). Taking this standard a step further, courts have held that even where the "model does not eliminate any alternative causes or contributing factors, that does not

defeat the predominance requirement." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 99 (S.D.N.Y. 2018) (citing *Waggoner*, 875 F.3d at 106).  Defendants' arguments – in which they claim Plaintiff's damages model is flawed because it does not break down each individual consumer's precise damages[4] – should be discarded at this class certification stage.[5]  *See Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 382 (S.D.N.Y. 2015) (reasoning "that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification"); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 181 (S.D.N.Y. 2008) ("Although the damages, if any, owed to each individual class plaintiff who succeeds on his or her claims will vary, that fact does not defeat certification if the method of calculating damages is common to the class.").

A plaintiff will satisfy the causation element by showing that his or her economic injuries were fairly traceable to the alleged misrepresentations on the product's packaging.  *See Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 454 (E.D.N.Y. 2013) (plaintiffs satisfied causation by stating that their economic injuries, the out of pocket cost of purchasing defendant's product, were fairly traceable to the defendant's misrepresentations on the product's packaging); *see also Ackerman v. Coca-Cola Co.*, No. 09 CV 395(DLI)(RML), 2013 WL 7044866, at *20 n.32, (E.D.N.Y. July 28, 2018) (to prove causation, plaintiff would have to show that "he or she paid a premium for [the product]"); *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 965-966 (9th Cir. 2018) (finding that a consumer's allegation that she would not have bought the product, but for the

---

[4]   In addition to Plaintiff's price premium and full refund theories of damages, where, as here, the calculated price premium will result in less than $50 in damages per class member, New York's consumer fraud statute provides for statutory damages.  *See* N.Y. Gen. Bus. L. § 349(h); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015).

[5]   *See* Kimberly-Clark Brf. at 8-9, 33, 41-42, 44; Costco Brf. at 39, 40.

misrepresentation, is sufficient to allege causation and economic injury).  Here, Plaintiff's hedonic regression model isolating price premiums for the "flushable" claims is consistent with his alllegation that Defendants' Flushable Products are falsely advertised because they are not in fact flushable.[6]

### B. Mr. Weir's Hedonic Regression Methodology Complies with Both *Daubert* and *Comcast*

#### 1. Plaintiff's Damages Model Is Consistent with His Theory of Liability

Defendants cannot credibly strike or exclude the appropriateness of hedonic regression analyses, which is lauded in econometrics.  Kimberly-Clark's own expert, as well as the experts of defendants Costco and Proctor & Gamble, testified as to the validity of the method.  The use of hedonic regression to isolate a falsely labeled attribute and then measure classwide damages on an aggregate basis has been approved by Courts.[7]  Defendants' rebuttal experts have not identified anything that would give rise to striking or excluding Mr. Weir's analysis *as inherently unreliable*.[8]

---

[6]  *See* Omnibus Memorandum of Law in Support of Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel, dated February 27, 2015 ("Pltf. Class Br.") at 29-31.

[7]  *E.g.*, *Hasemann*, 331 F.R.D. at 277–78; *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-14 (S.D.N.Y. 2015).

[8]  The purported lynchpin cases relied on by Defendants allowed the challenged hedonic regression analysis to be admitted as a question of "the strength of his opinion, not its reliability." *Schechner v. Whirlpool Corp.*, No. 2:16-cv-12409, 2019 WL 978934, at *5 (E.D. Mich. Feb. 28, 2019); *see also Overstreet v. Virts*, No. 14-CV-6582P, 2019 WL 1331567, at *21 (W.D.N.Y. Mar. 25, 2019) (denying motion to preclude expert's opinion testimony; the "court must 'focus on the principles and methodology employed by the expert, ***without*** regard to the conclusions the expert has reached or the [] court's belief as to the correctness of those conclusions'") (emphasis added); *In re ConAgra*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015); *Singleton v. Fifth Generation, Inc.*, No. 5:15-CV-474 (BKS/TWD), 2017 WL 5001444, at *7 (N.D.N.Y. Sept. 27, 2017) (finding expert's hedonic regression analysis admissible); *In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-428-JFW (JEMx), 2016 WL 787415, at *4 (C.D. Cal. Feb. 2, 2016) (finding expert's hedonic regression analysis admissible).

Nevertheless, Kimberly-Clark moved to strike, and Costco argues the Court should exclude (*see* Kimberly-Clark Brf. at 14, Costco Brf. at 25-26), the methodologies, data points or assumptions used by Mr. Weir, despite that: (i) Mr. Weir's methods have been tried, tested and sustained by Courts in class settings akin to the one here[9]; (ii) the rebuttal experts did not perform any complete independent analyses that could enable them to present competing results; and (iii) the rebuttal experts could only pose theoretical faults in Mr. Weir's work – *e.g.*, "[t]he purchase drivers discussed herein ***might*** drive purchasing behavior" (Ugone Supp. Decl. at ¶29, n.64); "Mr. Weir does not control for these differences, even though they ***could*** impact price" (*id.* at ¶71.c.iii.) – and have not established a concrete bias or fatal flaw for this Court to strike.

Without an economic basis to strike Mr. Weir's conclusions or methodologies, Kimberly-Clark proffers a *Comcast*-related argument – in the form a "*Daubert* motion" – suggesting that individual inquiries predominate and that the Court should not certify the class when, for example, there are questions about class members' reasons for purchase or post-purchase experiences with flushable wipes, or about whether class members were subject to deception.  To be clear, these arguments have no bearing on Defendant's request to disqualify Mr. Weir, his analyses, or his methodologies.  None of the minor critiques by Kimberly-Clark's experts about how Mr. Weir *could have* done things differently influence the admissibility of Mr. Weir's opinions; at most, they are issues that relate to the weight of the evidence.

---

[9]   *See, e.g.*, Plaintiff Brf. at 13 (citing cases); *see also Scotts*, 304 F.R.D. at 413-14 (accepting hedonic regression analysis at class certification and denying defendants' motion to exclude the opinions of Mr. Weir); *Langan v. Johnson & Johnson Consumer Cos., Inc*., No. 3:13-cv-1470 (JAM), 2017 WL 985640, at *6-*8 (D. Conn. Mar. 13, 2017) (denying motion to exclude Mr. Weir's hedonic regression analysis, finding analysis sufficient to comply with *Comcast* and noting "[p]laintiff therefore does not have to prove at this stage that Weir's analysis is completely accurate, but only that it is a reasonable method of calculating the class's damages"), *rev'd on other grounds*, 897 F.3d 88 (2d Cir. 2018).

Plaintiffs' liability case hinges on the premise that class members received and paid for something less (*e.g.*, *a product that does that not break down*) than what was advertised (*"flushable" or dispersible*). Consumers were injured at the moment of purchase. They have, therefore, suffered injury in the form of the price paid as compared to what was they received. The premium exhibited by Mr. Weir's hedonic regression analysis forms a seamless nexus between Plaintiffs' liability and damages theories.

### C. The Economic Model Utilized by Mr. Weir Is Suitable for Calculating Price Premium Damages on a Classwide Basis

#### 1. Mr. Weir's Qualifications

Economist Colin B. Weir was retained by Plaintiff to calculate price premium damages, on a class-wide basis, paid solely attributable to the misrepresentations as to the "flushable" claim. To accomplish this, he used a hedonic regression analysis. Mr. Weir is qualified to perform the analysis.[10] In fact, he is the only expert offered in connection with this litigation that has conducted a hedonic regression analysis from start-to-finish.[11] His damages models, including those he performed here, have been used to support class certification in consumer and, more specifically, false advertising cases.[12]

---

[10]   Mr. Weir's academic and professional background, as well as litigation experience and success of his models and methodologies are detailed in his supplemental Declarations. *See* Weir Supp. KC Decl. at ¶¶1, 21; Weir Supp. Costco Decl. at ¶¶1, 22.

[11]   *See* Plaintiff Brf. at 24, n.24 (citing testimony, *e.g.*, that Dr. Martin never ran a hedonic regression analysis from start-to-finish), 51-52 (citing testimony from Dr. Ugone confirming he has not conducted a hedonic regression analysis from "ground zero").

[12]   *See* Plaintiff Brf. at 13.

2.   **Mr. Weir Performed a Hedonic Regression Analysis to Isolate the Price Premium Associated with the "Flushable" Claim, as Used by Each Defendant, on a Classwide Basis**

Courts have used hedonic regression analyses to value classwide damages relating to product attributes in false advertising claims.[13]   Hedonic regression is an inherently reliable statistical calculation with built-in statistical measures to confirm reliability.

Here, Mr. Weir used hedonic regression to calculate the price difference between the value of the Flushable Products with and without the "flushable" claim.  *E.g.*, Weir Supp. KC Decl. at ¶¶36, 71-80.   To test whether this could be done, Mr. Weir complied with well-established principles and methodologies of hedonic regression by: (1) carefully identifying his research objective; (2) collecting and analyzing underlying sales, pricing and product attributes data; (3) performing market and product research, including reviewing corporate deposition testimony and product labels; (4) methodically selecting appropriate comparator products and attributes; and (5) running hedonic regression calculations utilizing his carefully crafted model.  *See* Plaintiff Brf. at 14-17 (citing Mr. Weir's supplemental declarations and explaining his methodology), *id*. at 25-26 (explaining Mr. Weir's work and consideration of flushable and non-flushable data, from various sources, to determine appropriate comparator products and product categories). Defendants cannot dispute that Mr. Weir performed the requisite steps, or that Mr. Weir failed to perform any necessary steps.  Mr. Weir's exhaustive work enabled him to discern which product attributes required single versus multiple "dummy variables" aside from or in addition to the

---

[13]   *See, e.g., Hasemann*, 331 F.R.D. at 277–78 (approving hedonic regression analysis for infant formula); *Scotts*, 304 F.R.D. at 413-414 (finding hedonic regression could value the premium associated with "50% thicker" claim); *Briseno v. ConAgra Foods, Inc.*, No. 15-55727, 2017 WL 53421, at *657 (9th Cir. Jan. 3, 2017) (affirming use of "hedonic regression to calculate price premium attributable to the '100% Natural' label"); *see also* Plaintiff Brf. at 13..

"flushable" claim.  Mr. Weir was thereby able to conclude that the "flushable" claim could be isolated.

Mr. Weir helped guide and coordinate the collection of sales data from over one hundred retailers, encompassing more than 116 products, over a nine-year time period.  He reviewed and considered pricing data, product attributes, weekly sales data (both dollar and unit sales), product/brand information, UPC information, pack size and other product information, from various sources, including Defendants' own business records, industry resources and independent market research (*e.g*., IRI and Nielsen), Drugstore.com and Amazon.com, etc.  *See, e.g*., Weir Supp. KC Decl. at ¶¶45-54.  Overall, Mr. Weir used more than 150 million lines of historic unit transactions over the proposed expanded class period.  These reliability metrics confirmed the appropriateness of the premium.  Mr. Weir derived a premium at 6.2% for Kimberly-Clark and 8.56% for Costco.  *See* Weir Supp. KC Decl. at ¶¶79-80; Weir Supp. Costco Decl. at ¶¶82-83, respectively.

### 3.    Legal Standard for *Daubert*

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  The *Daubert* test is a "liberal" and "permissive" standard of admissibility.  *Nimely v. City of N.Y.*, 414 F.3d 381, 395-96 (2d Cir. 2005).  Tasked with the "gatekeeper function" of ensuring the reliability of expert testimony, a trial judge "should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."  *Restivo v. Hessemann*, 846 F.3d 547, 575, 577 (2d Cir. 2017).  Arguments that the expert's "assumptions are unfounded 'go to the weight, not the

admissibility, of the testimony.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

At the class certification stage, courts in this Circuit have applied the *Daubert* standard but found that the "scope of the *Daubert* analysis is cabined by its purpose at this stage: 'the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23.'" *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015).  As a plaintiff would have to show that "the damages resulting from [the alleged injury] were measurable 'on a class-wide basis' through use of a 'common methodology'" in order to meet the Rule 23(b)(3) predominance requirement, *Comcast*, 569 U.S. at 30, an expert must simply "provide sufficient detail about the proposed methodology to permit a court to determine whether the methodology is suitable to the task at hand." *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742 (DLC), 2010 WL 3119452, at *9 (S.D.N.Y. Aug. 5, 2010).  In other words, "[t]he question is not . . . whether a jury at trial should be permitted to rely on [the expert's] report to find facts . . . but rather whether [the Court] may utilize it in deciding whether the requisites of Rule 23 have been met." *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (E.D.N.Y. 2000).

> ### 4.   Defendants Do Not Establish that Mr. Weir's Hedonic Regression Analysis Fails to Satisfy the *Daubert* Test or Meet the Predominance Standard

The question of reliability in a *Daubert* setting rests solely on principles and methodology, not on the conclusions that they generate.[14]  The crux of Mr. Weir's conclusion is that Plaintiff can

---

[14]   *See Reyes v. Delta Dallas Alpha Corp.*, No. 92 Civ. 4418(AGS), 2000 WL 526851, at *1 (S.D.N.Y. May 2, 2000) (admitting expert testimony and explaining that in "examining reliability, the focus must be *solely* on principles and methodology, not on the conclusions that they generate") (quoting *Merrell Dow Pharms.*, 509 U.S. at 589); *see also Overstreet*, 2019 WL 1661567, at *21 (denying motion to preclude expert's opinion testimony; the "court must 'focus on the principles and methodology employed by the expert, *without* regard to the conclusions the expert has reached or the [] court's belief as to the correctness of those conclusions'").

demonstrate classwide injury in the form of a price premium.  Defendants take issue with the conclusion itself and seek to exclude Mr. Weir's findings by cherry-picking certain assumptions, selections, or choices he made to conclude that the "flushable" claim – isolated and standing alone – can be valued, on a percentage or aggregate basis, of the overall value of the Flushable Products. Kimberly-Clark's economic expert acknowledged that it did not matter which analysis Mr. Weir performed, or method he employed, or assumptions he made, or data points he used.  Ex. 1(b) at 388:5-7.[15]  According to Dr. Ugone, this case requires individual inquiry and there cannot be a common proof approach.  *Id*. at 337:7-9; 370:13-23; 376:11-13; 388:7-9; 397:15-20; 398:18-20; 400:6-9; *see also* Ugone Supp. Decl. at ¶¶26-61.  In other words, Dr. Ugone and, in effect, Kimberly-Clark would have challenged Mr. Weir regardless of how he reached any form of common damages.

Defendants simply have not shown that Mr. Weir improperly isolated, or failed to isolate, the "flushable" claim.[16]  At best, Defendants' experts broach trivial points about how the hedonic regression analysis *could have* been employed differently.  Not one of the three rebuttal experts conducted an independent hedonic regression analysis to refute the reliability of Mr. Weir's methodology (*e.g.*, his selection of variables).  In the context of a *Daubert* challenge, therefore, Defendants' arguments fail and express nothing more than a dissatisfaction with Mr. Weir's ultimate conclusion.

---

[15]   Regardless of method, Dr. Ugone would have countered that classwide damages cannot be calculated here.  He admits that he would have criticized Dr. Weir's conclusions irrespective of the methodology used by Mr. Weir.

[16]   Mr. Weir's methodology was discussed at length in Plaintiff's opening memorandum, as was Plaintiff's response to Defendants' attacks on Mr. Weir's model.  *See* Plaintiff Brf. at 14-17, 24-44.

### a.    Mr. Weir's Price Premium Analysis Does Not Require Individual Inquiries

Mr. Weir's theory of damages is focused on, and measures, Plaintiff's loss of the benefit of the bargain.  He says, in line with Plaintiff's theory of liability, that Plaintiff and the putative class members he seeks to represent purchased a product that was intended – and safe – to be flushed into plumbing systems when, in fact, the products do not break down and were not safe to be used in the manner in which they were advertised.  ***All*** purchasers of the relevant products were thereby damaged as soon as they completed their purchase.  Mr. Weir's damages theory echoes a long line of false advertising cases supporting the proposition that no individual inquiry is necessary in connection with Plaintiff's loss of the bargain theory.[17]

Defendants ignore Plaintiff's and Mr. Weir's theory and, instead, claim that consumers, *e.g.*, must have purchased the Flushable Products solely because of the "flushable" claim, must have disposed of the Flushable Products as instructed (both in terms of how and where they dispose of the products) and must have understood that the condition of their plumbing systems could impact the ability of the Flushable Products to break up.  *E.g.*, Ugone Supp. Decl. at §VII. Specifically,  Kimberly-Clark proffered this argument despite knowing that it failed to disclose that the Kimberly-Clark Flushable Products were not flushable, and knew precisely what a reasonable consumer would believe when it saw or read the labeling highlighting "flushable" as

---

[17]    *Dzielak v. Whirlpool Corp.*, No. CV 2:12-89 (KM)(JBC), 2017 WL 6513347, at *9-*10 (D.N.J. Dec. 20, 2017) (citing *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 97-103 (D.N.J. 2011)) (distinguishing benefit of the bargain damages from individualized price inflation theory and emphasizing that the ENERGY STAR feature was a basis of the bargain and Plaintiffs did not receive it and were damaged); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 333 (D.N.H. 2017) (certifying class of consumers because they were "deprived of a measureable monetary portion of the benefit-of-the-bargain they had struck with Dial by buying Dial Complete with a superior efficacy claim on the label but, in fact, receiving a product that did not provide the promised superior efficacy").

both an advertising claim and the ***name of the product***.  Fundamentally, each putative class member paid more for the Flushable Products than they would have had the products' been accurately labeled.

The damages at issue are universal to the Class, and are directly connected to Defendants' false advertising campaign.  No individual inquiry is necessary.  At bottom, "barring class actions where individual damages determinations are necessary would [be] a dramatic shift in the law." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118 (S.D.N.Y. 2015).  Because, "if an individualized inquiry into damages were held to preclude class certification, it would effectively 'sound the death-knell of the class action device.'"  *Morales*, 2017 WL 2598556, at *22 (*quoting Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1054 (2012)).  Here, Defendants have catalogued a list of trivial individual inquiries[18] which, even if accurate,[19] do not form a basis to defeat predominance or, more generally, class certification.

To be clear, Plaintiff has not alleged a price inflation suit, which relies on a fraud on the market theory, and which could theoretically require individualized damage calculations.  *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188-189 (3d Cir. 2001) ("In class actions based on a 'fraud-on-the-market,' an excessive pricing policy for securities, or an antitrust violation, the alleged conduct itself causes economic injury . . . Determining which class members were economically harmed would require an individual analysis into each trade and its alternatives. The individual questions, therefore, are overpowering.").  Here, Mr. Weir calculated

---

[18]   *See* Kimberly-Clark Brf. at 14, 30, 41-42, 53-54; Costco Brf. at 26, 33; Ugone Supp. Decl. at 4-5, 21-22, 33, 35-36, 48, 51; Martin Supp. Rpt. at 26.

[19]   Notwithstanding the clear-cut law against individualized inquiries as a basis to defeat Rule 23's predominance requirement, Plaintiff addressed and discarded Defendants' inconsequential and premature positions on individual damages.  *See* Plaintiff Brf. at 17-21.

the price premium damages based upon the economic theory of product differentiation.  Plaintiff and the class members expected to receive products that were safe to flush.  They did not.

### D.   Defendants' Criticisms of Mr. Weir's Model Do Not Warrant Decertification

#### 1.   Mr. Weir Incorporated the Appropriate Attributes In His Hedonic Regression Model

Mr. Weir's detailed selection of relevant attributes has now been detailed through: (1) Mr. Weir's supplemental declarations[20]; (2) direct and cross examination testimony of Mr. Weir at the evidentiary hearing; and (3) Plaintiff's supplemental briefing in support of class certification.[21]   Any rebuttal expert can identify one or more attributes that *could* have been included, but Defendants do not refute that every hedonic regression analysis does not, and should not, include *all* attributes.  As a result, all regressions can be susceptible to quibbling over the selection of attributes.  *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("it is clear that a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case").

Kimberly-Clark molds its criticism to Mr. Weir's analysis of unrefuted decisions by saying that it did not include "major" attributes.  Kimberly-Clark Brf. at 18.[22]  But, it relies on decisions that represent the ***most extreme*** examples of an expert's omission of major variables, Kimberly-Clark Brf. at 19.  *See, e.g.*, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (noting

---

[20]   *See, e.g.*, Weir Supp. KC Decl. at ¶¶55-70.

[21]   *See* Plaintiff Brf. at 15, 25-30.

[22]   Even if Mr. Weir's analysis excluded important variables – which it did not – this would not be grounds to render his analysis inadmissible.  *See Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D 55, 71 (S.D.N.Y. 2018) (finding that whether plaintiff's expert's omissions, in a regression analysis, impermissibly biased the result was a matter for the jury to decide).

that the expert's "statistical analysis falls within the *Bazemore* exception - that "[t]here may . . . be some regressions so incomplete as to be inadmissible as irrelevant") (*citing Bazemore*, 478 U.S. at 400, n.10).   In *Bickerstaff*, plaintiff's expert was tasked to show, by a preponderance of the evidence, an inference of discrimination.  *Id.* at 449.  The Court there observed that the expert's statistical analysis did not "raise such an inference because it failed to control for nondiscriminatory causes" (*id.* at 448); failed to include two of the eight variables the expert himself determined was important (*id.* at 449)[23]; and there was "***no effort*** to account for nondiscriminatory explanations" (*id.* at 450).

Here, Mr. Weir considered or controlled for at least ***fourteen*** attributes.  *See* Weir Supp. KC Decl. at ¶¶56-70.  He did not examine the issue of liability (the "flushable" claim) in isolation, without accounting for other descriptors (non-flushable products or claims).[24]   In contrast, the *Bickerstaff* expert examined only the issue of liability (the discriminatory practices) to the exclusion of other explanations (the nondiscriminatory causes).   For this reason, *Bickerstaff* represents an "exception" as an outlier set of facts.  *Cf. Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 404 (S.D.N.Y. 2014) (representing an extreme example of omitted variable bias where the court identified a violation of "generally accepted statistical practice" and the expert "concede[d]" his exclusion of a "highly negatively correlated" variable); *In re Wireless*

---

[23]   The Court found that "[t]hese variables are too significant not to be accounted for in the regression analysis in this case" and "it cannot be said that these variables are not quantifiable or controllable."  *Id.*

[24]   Defendants' criticisms of Mr. Weir's use of non-flushable products – *i.e.*, moist wipes used for hygiene purposes without the "flushable" claim (*e.g.*, baby wipes) – is particularly ironic given Mr. Weir's research objective of measuring the value of the Flushable Products with and without the "flushable" claim.  This irony is inflamed by Defendants' conflicting criticisms that Mr. Weir failed to consider sufficient data while at the same time should have conducted his regression excluding over 75% of the data.  *See*, *e.g.*, Ex. 1(d) at 746:13-747:2.

*Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005) (noting that expert did not "introduce *any* independent variables into his analysis" and could not provide an explanation through his testimony) (emphasis in original).  The Court in *Reed* underscored the exception-not-the-rule nature of its holding, accentuating that "***passably*** scientific analysis must undergird the selection of the frame of reference" and that normally, "failure to include variables will affect the analysis' probativeness, not its admissibility."  *Reed Constr. Data Inc.*, 49 F. Supp. 3d at 400-01.

Defendants' challenge of Mr. Weir's reasoned selection of variables is a question to be decided by a jury and not grounds to strike his analysis or deny class certification.  *See Chen-Oster*, 325 F.R.D. at 71 (holding that even where expert arguably "did not properly account for 'key' variables: business units, job function, and employee productivity" whether those "omissions impermissibly biased the results [is] a matter for the jury to decide").  Kimberly-Clark's reliance on *Singleton* does not change this well-established application.  In *Singleton*, the Court dubbed the expert's analysis as "superficial" because plaintiff's expert made "little attempt to identify a relevant set of product attributes to plug into his hedonic regression model" other than "a few suggestions" and, perhaps most significantly, did "not explain[] how a hedonic regression model can isolate the effect of the '[false] representation' in this case while accounting for other relevant product attributes."  2017 WL 5001444, at *22.

Mr. Weir detailed his decision for inclusion, exclusion and/or control of variables, as well as the professional judgment and economic support for each.  *See supra* §II.C.2 (citing Plaintiff Brf. at 14-17, 25-26).  His underlying work and conclusion was subject to rebuttal expert work and cross-examination before this Court.  Given these opportunities, Defendants still have not presented any fatal flaws in Mr. Weir Weir's model of methodological approach other than to suggest conjectural alternatives.

2.     **Mr. Weir's Hedonic Regression Methodology Demonstrates Classwide Injury Throughout the Certified (and Proposed Extended) Class Periods**

Mr. Weir employed and ran hedonic regressions for the time periods that encompass the class periods certified by this Court, and then logically extended them to the present.  The decided time periods are well-reasoned and fit to Plaintiff's theory of liability.  Stated in the reverse, Mr. Weir's selected time periods are not random or indiscriminate, as Kimberly-Clark and Dr. Ugone suggest.  *See* Kimberly-Clark Brf. at 23 (referencing Mr. Weir's "cherry-picked" time period).  What is random, however, is Kimberly-Clark's decision to arbitrarily re-run Mr. Weir's analysis using time periods that fall *within* the class period – *e.g.*, 2010-2014 or 2010-2016 – but not conduct a fully-performed hedonic regression analysis using the actual, certified class period.

Setting aside the absence of any explanation on the part of Defendants' altering of time periods to try breaking Mr. Weir's measured and economically supported regressions, Mr. Weir ran additional regressions to account for the critiques raised in expert reports and at the evidentiary hearing.[25]  Mr. Weir's additional regressions were provided to Defendants, then introduced on the final day of evidentiary hearing, and were subject to cross examination by three separate defendants' counsel.  *See* Ex. 1(d) at 773:20-787:7.  Mr. Weir's supplemental work further accounted for purported label coding changes that Defendants' experts claimed existed.  *Id* at 773:20-774:3, 775:4-12, 775-25-776:7.[26]  As applied specifically to defendant Costco, Mr. Weir's additional analyses generated statistically significant price premiums for the dates associated with both the end of the certified class period (ending 2017: produced a 10.5% price premium) and the

---

[25]   *See* ECF Nos. 357-27, Pltf. Ex. 16; 357-28, Pltf. Ex. 17; 357-29, Pltf. Ex. 18; 357-30, Pltf. Ex. 19.

[26]   *See* Ex. 1(d) at 763:11-764:7, 767:15-21, 773:12-774:7, 775:20-776:7.

extended time period to the present (ending 2019: produced an 11.8% price premium).[27]   As applied to defendant Kimberly-Clark, Mr. Weir's additional analyses generated statistically significant price premiums for the dates associated with both the end of the certified class period (ending 2017: produced a 8.55% price premium) and extended the time period to the present (ending 2019: produced a 10.7% price premium).[28]   In both scenarios suggested by Defendants, and then ran by Mr. Weir, the hedonic regression models generated even *larger* price premiums than his original calculations that are statistically significant at the 99% confidence level.

Next, in a further endeavor to pacify his detractors, Mr. Weir ran additional regressions using dates or time periods *within* the class period, by rolling the start dates of his analyses forward. *See* Ex. 1(d) at 774:24-775:18; 776:18-777:24.[29]   Again, his newly-performed analyses resulted in increases to the price premiums for both defendants Costco and Kimberly-Clark.  *Id.*  For example, using the period of 2012 through 2017, the resulting price premiums were 12% and 12.3% for Kimberly-Clark and Costco, respectively.  For the period of 2013 through 2017, the resulting price premium was 12.4% for both for Kimberly-Clark and Costco.  *See*, *e.g.*, ECF No. 357-27, Pltf. Ex. 16; 357-29, Pltf. Ex. 18; Ex. 1(d) at 777:4-12.

The decision on the part of the rebuttal experts to suggest counter-regressions that worked backward – meaning, the elimination of years of the end of the certified class – evinces the concerted effort on the part of Defendants to run numerous counter-regressions until they found a

---

[27]   *See* ECF No. 357-27, Pltf. Ex. 16; 357-29, Pltf. Ex. 18.

[28]   *See* ECF No. 357-28, Pltf. Ex. 17; 357-30, Pltf. Ex. 19.

[29]   *See also* ECF Nos. 357-28, Pltf. Ex. 17 (showing "Flushable" price premiums for the following time periods: 2011-2019, 2012-2019, 2013-2019, 2011-2017, 2012-2017 and 2013-2017), 357-30, Pltf. Ex. 19 (showing "Flushable" price premiums for the following time periods: 2010-2019, 2011-2019, 2012-2019, 2013-2019, 2010-2017, 2011-2017, 2012-2017 and 2013-2017).

version that could reduce Mr. Weir's price premium findings.[30]   Kimberly-Clark purposefully reported on only those time-periods it could claim generated different results over different periods of time, *see* Kimberly-Clark Brf. at 23-25,[31] and so it could claim that Mr. Weir "cherry-picked a time period to impact the outcome."  *See id*; *see also* Costco Brf. at 21-22.  Its goal was to narrow the examined time period for the purposes of excluding portions of the underlying data, thereby reducing the likelihood that a statistically significant result can be reached.  In effect, the experts have not identified a flaw in Mr. Weir's model; rather, they changed the model entirely and then claimed that the modified model was statistically insignificant (*see* Ugone Supp. Decl. at ¶¶79-82) or showed a reduced price premium.

Finally, according to Dr. Ugone, "Mr. Weir's claimed price premium decreases and loses statistical significance for the 2010-2016 time period."  ECF No. 356-8, Defendants' Ex. I at 7.  Significantly, Dr. Ugone does not say the price premium is eliminated – only that it decreased.  A price premium, even under certain of Dr. Ugone's manipulated time periods, still exists.[32]

### a.      Challenges to Statistical Significance Do Not Defeat Class Certification

Courts have found that statistical significance goes to the weight of expert's model.  *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46-47 (S.D.N.Y. 2018) (rejecting argument

---

[30]   *See, e.g.*, Ex. 1(c) at 434:1-3, 17-20; 435:6-9, 15-16 (Dr. Ugone could not speak to how many counter-regressions were performed by Analysis Group, other than that he "would be surprised if we ran 100").

[31]   *See also* Ex. 1(c) at 605:5-9 (Dr. Scott: "I just wanted to see how far back you would need to go in order to get, you know -- to see what happens when you work backwards, because if I work even farther backwards, given the trend, it's going to get just worse. So I just wanted to see, let's just take one year back and see what happens").

[32]   *E.g.*, 2010-2017 = 5.7%; 2010-2016 = 3.8%; and 2010-2015 = 2.2%.  None of his time period changes resulted in a zero price premium.

that there was no price impact because the confidence interval was below 95%); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491, at *11 (N.D. Cal. Apr. 12, 2017) ("courts generally have found that a statistical confidence level is more a matter of weight than admissibility"); *see also In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509-LHK, 2014 WL 1351040, at *15 (N.D. Cal. Apr. 4, 2015) ("*High-Tech*") ("The Court finds that the fact that these two variables are not statistically significant at the 1%, 5%, and 10% levels goes to the weight, not the admissibility of [expert's] model"); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1102, 1105 (D. Colo. 2006) (rejecting argument that "statistical significance is a threshold requirement for establishing the admissibility of expert testimony involving the use of statistics" and holding that no court "has adopted a rule barring admission of any epidemiological study that was not statistically significant at the 95–percent confidence level").[33]   Accordingly, questions as to the statistical significance of any of Dr. Ugone's manipulated regressions should not be determined at the class certification stage.

---

[33]   *See also Anghel v. Sebelius*, 912 F. Supp. 2d 4, 11 (E.D.N.Y. 2012) (using a 90% confidence interval); *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, No. 5:11-CV-1755, 2015 WL 6082122, at *8 (N.D. Ohio Sept. 30, 2015) (noting that "attacks on statistical significance generally do not address admissibility"); *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir.2001) (use of five percent test is arbitrary).

### 3.   The IRI Data Collected and Then Utilized by Mr. Weir Is in Reliable Form and Supports His Economic Analysis

Mr. Weir utilized sales data that were obtained from IRI[34] through third-party subpoenas issued, in the first instance, on December 1, 2014, and then, more recently on May 21, 2019.[35] The IRI data set included weekly sales data of flushable wipes, other wipes (or, non-flushable wipes), and toilet tissue from February 2010 through May 2019.  The data is broken down by product/UPC, the Dollar and Unit Sales (both on a promotional and non-promotional basis), as well as brand, pack size, and other product information.[36]

Courts have analyzed economic analyses derived from IRI-sourced data, and have adopted hedonic regression analyses that utilized IRI sales data as the underlying or supporting resource.[37]

---

[34]   Mr. Weir separately utilized sales data that was produced by Costco, originally in connection with the discovery process in this action that concluded in February 2015, and then, more recently following the Second Circuit remand, between July 2-16, 2019.  Defendant Kimberly-Clark did not produce any sales data to Plaintiff after the Second Circuit remand or in connection with the evidentiary hearing held by this Court.

[35]   Only seven days after the Second Circuit's remand.

[36]   As explained by Mr. Weir, "IRI data does include myriad products and we're able to get a sufficient read on the flushable value through, for example, the examination of those products." Ex. 1(a) at 212:2-5.  In addition to reviewing the IRI data, Mr. Weir reviewed materials provided by IRI regarding its data collection procedures. *See, e.g.*, Weir Supp. KC Decl. at Ex. 2 at 2 (referring to Mr. Weir's review of certain IRI files).  For example, the IRI data includes sales information from many major retailers, including Walmart, Target, Kmart, BJ's and Sam's Club warehouse stores, and discount retailers such as Dollar General and Family Dollar.  Exhibit A to the Declaration of Vincent M. Serra in Support of Plaintiff's Omnibus Reply Memorandum of Law in Opposition to Defendants' Post-Hearing Briefs, in Opposition to the Motion to Strike Colin Weir's Methodology and Conclusions, and in Further Support of Plaintiff D. Joseph Kurtz's Motion for Class Certification ("Serra Reply Decl.") (April 17, 2017 Multi-Outlet Reporting), submitted herewith.  It also includes data from grocery stores and drug stores across the country. *Id.*  These documents were produced to Defendants on June 25, 2019.

[37]   *See e.g.*, *Schmitt v. Younique LLC*, No. SACV 17-1397JVS(JDEx), 2019 WL 1431906, at *10 (C.D. Cal. Jan. 10, 2019) (accepting plaintiffs' expert's proposed methodology using a hedonic regression including IRI data); *Zakaria v. Gerber Prods. Co.*, No. LA CV15-00200 JAK (Ex), 2016 WL 6662723, at *15-*16 (C.D. Cal. Mar. 23, 2016) (finding plaintiffs demonstrated that damages may be calculated on a classwide basis through their expert's hedonic regression using

Notwithstanding the reliability of, and extensive support for, the use of IRI data in the manner Mr. Weir has done here, Kimberly-Clark challenged the utility or verified reliability of the IRI data.  Kimberly-Clark Brf. at 5, 6, 8, 26, 27, 28 (relying on *In re Amla Litig.*, 16-cv-6593 (S.D.N.Y. Aug. 7, 2019) Hr'g Tr. (D.E. 354-1) at 21:15-18, 39:21-41:15).   The singular, unpublished, bench ruling in *AMLA* relied on by Kimberly-Clark was issued after Judge Rakoff certified a class of New York purchasers, denied defendant's motions for summary judgment, and further denied defendant's motion to decertify the class.[38]  There, Judge Rakoff was critical of the exclusive use of IRI's projections (and not the underlying data) and specifically questioned why additional information was not obtained from IRI.  *See In re Amla Litig.*, 16-cv-6593 (S.D.N.Y. Aug. 7, 2019) Hr'g Tr. (D.E. 354-1) at 42:6 ("They could have subpoenaed IRI.").  Here, there is no dispute that Mr. Weir collected wide-ranging data and materials, including in response to Plaintiffs' subpoena on IRI[39] and, unlike in *Amla*, Mr. Weir reviewed IRI's underlying methods and determined that the margin of error is less than 1%.

What is more, Mr. Weir testified that he "looked at a number of indicia of the IRI data including its use by companies generally and defendants in this case" and "looked at information

---

data from IRI); *ConAgra*, 90 F. Supp. 3d at 945-948 (finding Mr. Weir's methodology using IRI data in a hedonic regression was sufficient).

[38]   *In re AMLA Litig.*, 282 F. Supp. 3d 751 (S.D.N.Y. 2017) (certifying class of New York purchasers); *In re AMLA Litig.*, 320 F. Supp. 3d 578 (S.D.N.Y. 2018) (denying motion for summary judgment); *In re AMLA Litig.*, 328 F.R.D. 127 (S.D.N.Y. 2018) (denying motion for decertification).

[39]   Mr. Weir's work here is unlike the expert work performed in *AMLA*, in which, at least according Kimberly-Clark, "forms the basis for ***everything*** that Plaintiff purports to use to attempt to show that injury and causation can be proven on a classwide basis through common proof." Kimberly-Clark Brf. at 27 (emphasis added).  Counsel for defendant Costco, during their cross examination of Mr. Weir, recognized that IRI was not Mr. Weir's sole source of data: "you decided to merge the Costco data with the IRI data and in that merged dataset?"  Ex. 1(a) at 213:15-16.

provided by IRI to understand their data collection methods" and that "there were other sources of data against which [he] *was able to compare the IRI data to determine that they were in agreement across multiple sources*." Ex. 1(a) at 148:2-9; *see also id*. at 21:22-25 (Mr. Weir confirmed that IRI was not the sole source of the data he collected and considered). With respect to his determination of the variable of interest, Mr. Weir testified that he "obtained that data from a combination of the IRI data and a review of various product labels." *Id*. at 26:24-27:2.

In perhaps the most disingenuous argument against the reliability of IRI data, Kimberly-Clark expressed to this Court: "Kimberly-Clark does not use IRI data in the normal course of business. Hr'g Tr. (Ex. A) 40:10-22." Kimberly-Clark Brf. at 27, n.14. Not true. By way of example, at the evidentiary hearing, Kimberly-Clark introduced, as Kimberly-Clark Exhibit I (ECF No. 357-12, KCC-Kurtz0020245-269), a document that Mr. Champa described as a product update prepared by Kimberly-Clark for it's retailers (including defendant Costco). Tr. 281:17-282:2. On page 4 of the document, Kimberly-Clark outlined a Cottonelle performance update, including point of sale data. As the source for the information used by Kimberly-Clark, the document states: "Source: IRI WE 10/30/16." ECF No. 357-12 at KCC-Kurtz0020248.[40] Kimberly-Clark may have an explanation for why it relied on IRI as the source of information or data on its own prepared document, but the document, which Kimberly-Clark introduced through its own witness, proves that Kimberly-Clark does, in fact, utilize IRI data for its own business objectives or purposes. And this is not the sole page reference prepared and introduced by Kimberly-Clark that relies on IRI as the source. *See id.* at KCC-Kurtz0020250 ("Source: IRI") and KCC-Kurtz0020251 ("Source: IRI").

---

[40]   It is also worth noting that Kimberly-Clark's expert, Dr. Ugone, recognizes that IRI data "is reliable and sufficient to support a hedonic regression analysis." *ConAgra*, 90 F. Supp. 3d at 948 (citing Mr. Weir's reply declaration).

The baseless challenge against the reliability of IRI data should, therefore, be discarded, as: (1) Defendants themselves rely on it; (2) Mr. Weir reviewed IRI's underlying methods and determined its reliability for the purposes of his hedonic regression analysis; (3) Plaintiff subpoenaed the actual underlying data from IRI, which was considered and utilized by Mr. Weir; and (4) Courts have accepted the use of IRI by economic experts and, more specifically, damages experts in the context of measuring classwide injury.

### 4. Defendants Have Not Identified a Single, *Required*, Omitted Variable

While Plaintiff, by and large, anticipated and preemptively addressed the arguments he expected Defendants to make in his opening memorandum, he did not expect Kimberly-Clark to point out that it increased the *wholesale* price it charged to retailers due to increased costs to its Flushable Products in 2016. Because, in or around this same time-frame, Kimberly-Clark modified the substrate technology it used in its Flushable Products. The price increase that it passed on to retailers corresponds with that timing and is reflective of the price increase.[41] *See* ECF No. 357-12, Kimberly-Clark Ex. I at KCC-Kurtz0020261, 263 (discussing Q3 2016 "innovation" that improved strength loss and dispersibility); ECF No. 357-9, Kimberly-Clark Ex. F, KCC-Kurtz002005 (referring to "[b]inder" change in Q3 2016). Its 2016 price increase all but admits that Kimberly-Clark priced in a premium value for its "flushable" claim through the material input costs associated with manufacturing its Flushable Products.

---

[41]   Mr. Champa, testifying on behalf of Kimberly-Clark and in response to direct questioning by his own counsel, could not speak specifically as to Kimberly-Clark's pricing changes (Champa: "I wouldn't have knowledge of that data." Ex. 1(b) at 243:6-10), but he testified as to at least one price increase and ascribed it to an "increase in pricing that was driven by an increase in our material input costs" ( *id.* at 243:23-24).

Defendants argue that the Michigan District Court's decision in *Schechner v. Whirlpool*[42] to the facts and circumstances here. Setting aside the fact that *Schechner* was decided under Sixth Circuit law[43] and that the decision has been appealed,[44] Plaintiff addresses Kimberly-Clark's misapplication of the *Schechner* decision as follows:

Kimberly-Clark claims that Mr. Weir ignored "the fact that the prices that Kimberly-Clark charged retailers for flushable wipes increased in 2016" when the cost of manufacturing its flushable products rose. Kimberly-Clark Brf. at 17. It then leaps to the conclusion that, as in *Schechner*, Mr. Weir failed to account for this "supply side" factor. *Id.* What Kimberly-Clark's argument expressly leaves out of that argument is that the *Schechner* Court's supply side analysis hinged solely on a separately performed conjoint analysis – ***not*** hedonic regression.[45] *Schechner* at 16 (conjoint analysis discussion, pages 15-18); Kimberly-Clark Brf. at 17, 31 and 48. The reasoning behind the supply side analysis in *Schechner* (which is subject to appeal) was that the

---

[42]   *Schechner v. Whirlpool Corp.*, No. 2:16-cv-12409-SJM-RSW (E.D. Mich. Aug. 13, 2019), ECF No. 176 ("*Schechner*").

[43]   Courts in this Circuit require only a *workable* methodology at this stage. *See*, *e.g.*, *Singleton*, 2017 WL 5001444, at *18 ("[a]t this stage, Plaintiff is not required to definitively prove materiality, but rather simply to show that it *can be* proven") (emphasis in original); *ConAgra*, 90 F. Supp. 3d at 1032, n.285 ("plaintiffs have proffered a damages methodology that can account for many of the variables *ConAgra* identifies; as a consequence, a 'workable method of calculating damages for the proposed class [can] be achieved.'"). This is reason, in and of itself, for this Court to find the *Schechner* decision to be unpersuasive.

[44]   *See In re Toby Schechner*, No. 19-111 (6th Cir. 2019), ECF Nos. 1, 4.

[45]   The same holds true for *In re NJOY Consumer Class Action Litigation*, 120 F Supp 3d 1050, 1119 (C.D. Cal. 2015), upon which Kimberly-Clark relies, where the Court found that, in the context of *conjoint analysis*, the price of a product is a combination of market demand and supply. Even so, the supply-side argument is often raised – and rejected – in the context of conjoint analysis. *Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2018 WL 4952519, at *18-*19 (N.D. Cal. Sept. 25, 2018) (citing and discussing cases granting class certification over supply-side arguments).

question surrounding the efficacy of the self-cleaning feature in the "AquaLift" ovens involved whether the feature did not work *at all* or worked only *partially*. *Id.* at 17. The conjoint-related issue there rested on whether supply side considerations were, or could be, determined for a "partial-clean" oven that is debatably without comparator products and that may not, therefore, be tied to plaintiffs' theory of liability. Here, no such partial benefit nuance exists. Plaintiff alleged, and discovery substantiated, that the "flushable" claim is false[46] – for *every* Kimberly-Clark Flushable Product, and without *any* flushable benefit to consumers whatsoever.

Kimberly-Clark next argues – this time, at least, in connection with the hedonic regression in *Schechner* – that "confounding factors" must be accounted for in a hedonic regression analysis. Kimberly-Clark Brf. at 19. In *Schechner*, the Court accepted a merits-based question as to whether AquaLift ovens added features other than the self-cleaning mechanism at issue. *Id.* at 19. Whirlpool had argued that the introduction of its AquaLift ovens added a variety of purported benefits to consumers – *e.g.*, larger oven window; less odor; reduced heat; more cavity space; etc. – and that these added benefits *only* existed in AquaLift ovens. The Court there held that the multiple attributes introduced in conjunction with one another could have been separated out from the cleanability feature at issue in the price premium analysis. Defendants here cannot argue that the introduction of its Flushable Products enabled the introduction of other ancillary features, such as moisture (which was a feature of wipes before the false "flushable" labeling claim was introduced), texture (same), brand name (same), scent (same), thickness (same), or cleaning ability (same). Therefore, even to the extent the Sixth Circuit does not reverse the *Schechner* opinion, the uniqueness of the underlying facts as well as the distinctive conjoint and regression analyses at issue there, have no relevance here.

---

[46] *See*, *e.g.*, Pltf. Class Br. at 8-12.

Kimberly-Clark also cites *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012) to support its argument that unaccounted for "confounding factors" plague Mr. Weir's analysis. *See* Kimberly-Clark Brf. at 19, n. 12. In *Live Concert*, plaintiff's expert, at a hearing on class certification, acknowledged to the Court that he failed to consider or account for "artist popularity" – "undoubtedly a 'major factor' in determining ticket prices" – in his yardstick analysis. 863 F. Supp. 2d at 975-76. Despite that expert's admitted failure, he simply "assumed" as a conclusion that this disparity in price was the result of defendants' anticompetitive conduct. *Id*. at 975. Defendants, there, submitted unrefuted evidence regarding the existence of and, more significantly, the economic impact that popularity of the artists promoted by defendants. The combination of: (i) the excluded variable; (ii) an adequate showing by defendants as to the (actual, not theoretical) economic impact of that exclusion; and (iii) that the expert "himself has acknowledged that artist popularity affects ticket prices," led the Court to find that this was a "glaring flaw" on the part of the expert. *Id*. The *Live Concert* Court emphasized the importance of evaluating criticisms on experts' methodologies and assumptions, saying that "the Court cannot simply assume that variables omitted from the analysis are, in fact, 'major factors' which should have been included. There must be some indication that the excluded variables would have impacted the results." *Id*. at 974 (citing *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988) ("We read Bazemore to require a defendant challenging the validity of a multiple regression analysis to make a showing that the factors it contends ought to have been included would weaken . . . the analysis.")).

Thus, Defendants' attempts to compare and conflate Mr. Weir's hedonic regression analysis – which does not suffer from omitted variable bias or confounding factors – with dissimilar and highly distinguishable circumstances ring hollow.

### E. Market Conditions Do Not Undermine the Reliability of Mr. Weir's Hedonic Regression Model

Defendant Costco repeats and discusses, on at least four separate occasions in its brief, what it believes are three market conditions that must exist for a hedonic regression to be used to estimate a price premium associated with an attribute. *See* Costco Brf. at 10, 16-18, 27, 34-37. Specifically, Costco argues that the following market conditions must be met – and ostensibly are not met here – before hedonic regression can be applied: (1) there cannot be perfect collinearity; (2) a perfectly competitive market; and (3) the attribute of interest must be "cleanly defined." *E.g.*, *id.* at 16. Simply recapitulating again and again what it believes are conditions that have not been met here, however, does not in fact transpose those purported conditions into barriers for the application of hedonic regression in this instance.

### 1. Mr. Weir's Model Does Not Suffer from Problems with Perfect Collinearity[47]

Costco argues that in order to use hedonic regression to estimate a price premium associated with a product attribute, there cannot be "'perfect collinearity' – [*i.e*.,] the attribute of interest and another attribute cannot always be exclusively found together in products." Costco Brf. at 11; *see id*. at 16 (perfect collinearity occurs when "'products with the attribute of interest also share another attribute that's unique to those products.'"). "Collinearity," in this context, simply means "that multiple correlated independent variables are competing to explain the same dependent variable." *High-Tech*, 2014 WL 1351040, at *21, n.51. Dr. Martin contends that because all flushable products are "adult" products and all non-flushable products are "baby/toddler" products, hedonic regression cannot be used to determine a value for Costco's

---

[47] While Dr. Martin's supplemental declaration refers to both "multicollinearity" and "collinearity," testimony at the evidentiary hearing clarified that these terms are used interchangeably. *See*, *e.g*., Ex. 1(a) at 29:19-24.

"flushable" claim.  Costco Brf. at 18-19.  In other words, according to Dr. Martin, being flushable is collinear with being an adult wipe, and not being flushable is collinear with being a baby wipe. Dr. Martin's argument, however, is both legally and factually inapposite.

As the Second Circuit has held, "[t]he failure, by either side, to include a relevant variable (or the inclusion of an irrelevant or ***multicollinear variable***) will go to the probative value of the analysis, not its admissibility."  *Sobel*, 839 F.2d at 36; *see also In re Air Cargo Shipping Servs. Antitrust Litig*., No. 06-MD-1175(JG)(VVP), 2014 WL 7882100, at *19 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (whether a regression model "***may*** be tainted by multicollinearity goes ***purely*** to its weight," not its admissibility).  And courts have held that "disputes about the appropriate degree of collinearity in a regression model do not defeat class certification." *In re Korean Ramen Antitrust Litig*., No. 13-cv-04115-WHO, 2017 WL 235052, at *13-*14 (N.D. Cal. Jan. 19, 2017) (defendants failed to show that multicollinearity "fatally undermine[d expert's] showing of classwide injury"); *High-Tech*, 2014 WL 1351040, at *21, n.51 ("Other courts have admitted regressions even in the face of expert disagreement regarding whether collinearity posed a problem . . . This is not surprising given that the concept of collinearity is not a methodology, but a common phenomenon that results when using the methodology of regression analysis.").[48]

Costco's reliance on cases purportedly holding that collinearity creates a problem for class certification is misplaced.  For example, in *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923, at *10-*11 (N.D. Cal. Dec. 15, 2014), plaintiff's expert failed to

---

[48]  *See also In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d 651, 660–61 (7th Cir. 2002) (refusing to second-guess district court's admission of defense regression analysis where parties' experts disagreed on whether collinearity problem had been resolved or if regression was fundamentally unreliable).

distinguish between the variable of interest – the presence of "All Natural" and "Evaporated Cane Juice" labeling claims – and the Blue Diamond brand name, despite the Court determining that it was "'essential'" to control for brand loyalty.  *Werdebaugh* was decided on a motion to decertify the class, after the Court had certified the class based on plaintiff's expert's proposed methodology. *Id.* at *1, *4.  Only after "the close of fact discovery," however, plaintiff's damages expert acknowledged that he could not conduct the proposed method because the underlying data needed to effectuate the analysis did not exist.  *Id.* at *9 ("there were no weekly periods in which to ascertain" the regression data).  Indeed, the expert collapsed the "brand" and "label" variables into a single variable, thus preventing him from isolating the harm attributable "only to the labeling claims, rather than to the joint effect of both the labeling claims and the value of Blue Diamond's brand." *Id.* at *10.  Here, unlike in *Werdebaugh*, Mr. Weir's model does not confound the variable of interest (*i.e.*, flushability) with another attribute such that it measures only a "'combined effect.'" *Id.* at *10-*11; *see also* Ex. 1(a) at 30:6-16 ("[i]f the variable that you are describing as being collinear is not the variable of interest then there is no difficulty with running the model.").  Rather, Mr. Weir's model separately controls for various attributes, including brand, and "flushability." *See* Weir Supp. KC Decl. at ¶¶36-40, 55-70.

More significantly, the Court's decision to reject the hedonic regression model in *Werdebaugh* hinged on a flawed assumption on the part of the damages expert – specifically, that the challenged claim existed only on the product at issue in the litigation.  Discovery showed, and the Court observed, that at least two competitors utilized the same challenged advertising claim. 2014 WL 7148923, at *12.  This discernable flaw, which the Court allowed the expert to try and correct (but he did not), was a theme throughout the *Werdebaugh* court's opinion. *Id.* at *10 ("Dr. Capps did, in fact, assume that only Blue Diamond products used the challenged labeling

claims and that no competitor products used the challenged labeling claims."); *Id.* at *13 ("Dr. Capps assumes, without investigating, that all competitor products do not use the labeling claims at issue."); *Id.* at *6, n.3 ("Dr. Capps did not verify whether the non-Blue Diamond products in his dataset did or did not use the labeling claims."); *Id.* at *13, n.8 ("he does not represent that he verified the labels of the other competitor brands").  Defendants do not point to this flaw, or even a comparable weakness, in Mr. Weir's methodology.  Indeed, here, Mr.Weir properly analyzed products with and without the "flushable" claim after careful review of product labels for every product included in the analysis.

Costco also cites *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 5794873, at *9-*10 (N.D. Cal. Nov. 6, 2014), where defendant's expert (Dr. Scott) argued that plaintiff's regression model failed due to perfect collinearity between the "brand" and "label" variables.  But the Court ***rejected*** this argument, finding that the model ***properly*** controlled for the impact of the Dole brand on price.  *Id.*  Costco cites *Brazil*, however, for the notion that a hedonic model must contain products where a labeling claim is made and other products that do not have the claim.  *Id.* at *12.  The model in *Brazil* failed to meet even this basic requirement or satisfy *Comcast* because, in part, the expert could not verify whether the non-defendant products actually made the "All Natural" labeling claim.  *Id.*[49]  Here, Mr. Weir's model controls for the "flushable" claims and there is no dispute that the products he coded as "flushable" made a "flushable" claim and the products he coded as not "flushable" did not.

---

[49]   Plaintiff's regression model in *Brazil* was plagued with other "troubling aspects," including contradictory opinions offered by plaintiff's expert "regarding the efficacy of regression modeling when the label statement on a product has not changed during the class period," and the blanket adoption of the hedonic regression coefficient from Professor Anstine's 2007 study simply because the study also involved an "All Natural" claim, despite generating a damages estimate twice as large as under either of the expert's two other damages scenarios.  *Id.* at *13.

In *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 460 (S.D. Cal. 2014), plaintiffs "failed to produce **any** expert testimony" at all that "even attempt[ed] to isolate the amount attributed solely to the alleged misrepresentation" about defendant's representations that its lipcolor and makeup products provided 24 hour wear and "no transfer." The Court in *Algarin*, therefore, determined that the predominance element was not met given "Plaintiffs have not offered a method that would attach a dollar value to the alleged misrepresentations other than the general assertion – it exists and therefore it must be so." *Id.* Algarin stands in sharp contrast to this case, where Mr. Weir has presented a carefully crafted hedonic regression that has isolated the value of the "flushable" claims.[50]

Moreover, as discussed in Plaintiff's Brf. (at 41), Dr. Martin does not criticize **Mr. Weir's analysis** for suffering from perfect collinearity. Instead, she contends that **her own analysis** (using only data "'available at Costco'") cannot discern which attribute – "flushability" or "user" (*i.e.*, the attribute that is coded in Dr. Martin's model as either "adult" or "baby/kids") – affects the price

---

[50]   Additionally, *Herron v. Best Buy Stores, LP*, No. 2:12-CV-02103-TLN-CKD, 2018 WL 1960659 (E.D. Cal. Apr. 26, 2018), is inapposite. In *Herron*, the Court addressed whether plaintiff's damage model properly assessed a price premium due to allegedly misleading battery-life statements for laptops. *Id.* at *3. Specifically, defendant argued that Plaintiff did not use data for laptops sold without battery life representations and thus did not assess damages by considering "what the economic situation would have been absent the wrongdoing." *Id.* at *3, *5. The Court found that the damages model was not tied to plaintiff's liability theory as the model only compared laptops "with the exact same deceptive statements." *Id.* at *5. Here, Mr. Weir's model, as explained in Plaintiff's opening memorandum, *see* Plaintiff Brf. at 25-26, incorporated sufficient data for comparator products that did not include the false "flushable" claim. Moreover, unlike the Court determined in *Herron*, Mr. Weir's model here does not conflate any variables associated with the variable of interest – *i.e.*, "flushability," *see id.* at 5 (noting deficiency in damage model because "it conflates 'battery life' and 'battery life representations.'"), and does not attempt to address the precise degree of accuracy of Defendants' "flushable" claims (*i.e.*, plaintiff in *Herron* did not assert there was no battery, only that the representations of length of battery life were inaccurate).

and thus suffers from perfect collinearity.[51]  Mr. Weir's hedonic regression analysis, as previously

explained (*see* Plaintiff Brf. at 14-17), does not suffer from such criticisms.[52]

In any event, Dr. Martin's collinearity argument is economically unsound as it can be

disentangled to determine the direction the collinear variables are pushing on the dependent

variable – *i.e.*, price, based on the following undisputed truths:[53]

- At Costco, having a "flushable" claim is correlated with the "adult" user variable (*e.g.*, flushable wipes) and not having a "flushable" claim is correlated with the "baby/kids" variable (*e.g.*, baby wipes products).  Martin Supp. Rpt. at ¶16.

- Dr. Martin affirmed that, all else holding equal, baby wipes products at Costco will be ***more*** expensive than adult ("flushable") products given the larger pack size of baby wipes products.  *See* Ex. 1(d) at 740:15-20 ("baby wipes are sold in larger packages and so they have a higher price in the market").

- Dr. Martin's model shows a price ***discount*** for Costco baby wipes products even though one would otherwise expect the "baby/kids" variable to drive the price ***up***.

---

[51]  Dr. Martin argues that there is insufficient variability in the underlying data for the "flushable" and "user" variables – yet her solution is to limit the underlying data even further by focusing on only Costco products and thereby eliminating 75% of the data from Mr. Weir's model.  This approach makes no sense given her conclusion that the Costco-only data lacks variability. Dr. Martin's model excludes 116 products from Mr. Weir's analysis – which, as she recognizes, includes "13 brands, including Pampers, Charmin, Scott, and . . . seven different types of wipes" – in an attempt to run ***her narrowed model*** using only Costco products. Ex. 1(d) at 671:15-17.

[52]  Dr. Martin attempted to extrapolate her multicollinearity findings from ***her*** modified regression to Mr. Weir's model (an analysis which was not included in her report or provided to Plaintiff or the Court), arguing that "it would be physically impossible for the model to estimate both a flushable Costco-specific attribute and a baby kids attribute" utilizing Mr. Weir's "merged" data (IRI plus Costco data). Ex. 1(d). at 728:20-25.  But Dr. Martin's conjecture is simply unsupported by the record evidence.  In an attempt to support these conclusions post hoc, however, Costco relies on the opinions of Dr. Scott (Procter & Gamble's expert) – who is ***not*** an economist, but a ***marketing*** expert, and opined ***only*** on the regression analysis performed in the *Belfiore* matter – to support the theory that collinearity problems "exists in the IRI data as well." *See* Costco Brf. at 19.

[53]  At the evidentiary hearing, Dr. Martin testified that she would "certain[ly] consider" a "proposal for disentangling those collinear attributes."  Ex. 1(d) at 736:4-6.  Disentangling collinear variables simply means determining each variable's impact on the variable of interest (here, the "flushable" claim).

*See* Martin Supp. Rpt. at ¶17, Fig. 4 (showing negative coefficient for "baby/kids" variable).

- Despite the existence of perfect collinearity in Dr. Martin's model, the only explanation for the price discount for the "baby/kids" variable (which is, again, associated with being "non-flushable") is that a ***lack*** of flushability is the variable that is driving the price ***down*** in her model.

Because coefficients are inversely proportional when reversed, the negative price premium for the "baby/kids" variable in Dr. Martin's model means there is a ***positive*** coefficient for the "adult" variable, which is associated with the "flushable" claim.  Stated differently, given Dr. Martin's testimony about Costco baby wipes products being more expensive than Costco adult flushable wipes, the expected impact on the "adult" variable in Dr. Martin's model would be a reduction in price.  The only explanation for the positive coefficient for the "adult variable," therefore, is the presence of the "flushable" claim that is correlated with it (because the "adult" variable is driving the price down).  Thus, while we do not know the precise price premium associated with the "flushable" claim in Dr. Martin's model, a positive premium irrefutably exists, which is all that is required to demonstrate injury at this stage.

### 2. Mr. Weir's Hedonic Regression Analysis Does Not Suffer from Problems Associated with Perfect Competition

Defendant Costco maintains that "for the results of a hedonic regression to be interpreted as a price premium, there must be perfect competition."  Costco Brf. at 11, 12, 16, 27, 34-35.  Costco's expert Dr. Martin, however, does not fully agree with that unwavering position.  Dr. Martin testified that the lack of a perfectly competitive market does not, itself, defeat a reliable hedonic regression analysis.  Ex. 1(d) at 651:14-22 (Dr. Martin:  "I want to be clear, I'm not saying you can't run a hedonic regression in a market that's not perfectly competitive.").

Mr. Weir further countered Costco's view, saying "I would not suggest that perfect competition is a requirement for running a hedonic model" and adding that, as a practical reality

"[u]nless you are at the Chicago Mercantile Exchange with grains, all consumer product markets are to varying degrees differentiated product markets." Ex. 1(a) at 220:5-11. In Mr. Weir's view, "[t]here really is no such thing as a market with perfect competition. *Id*. at 220:22-23.

Dr. Martin, despite professing her belief that the moist wipes market is not perfectly competitive, testified at the evidentiary hearing that she was unaware of an example of a consumer product (other than a commodity) sold in a perfectly competitive market. When asked for an example, she referred the Court to the hypothetical "widgets" scenario she framed in her testimony or "the stylized example I gave to the Court" because she could not identify a single instance in which she would agree that a ***real*** – and not imaginary – product is sold in a perfectly competitive market. Ex. 1(d) at 704:2-6. When pressed further for any real-world examples:

> Q Can you give the Court an example of a perfectly competitive market, other than the widget hypothetical?
>
> A Yeah, I think commodities market, generally. I mean, it used to be things like milk and eggs. But now there are sort of more variation in those product categories, but -- but it's really any market where the product's relatively homogenous. You know, real commodities markets, you know, we have corn futures and pork belly futures, or whatever they are. Those are certainly perfectly competitive markets, in the consumer space.

*Id*. at 742:11-20 (demonstrating Dr. Martin's refusal to acknowledge that even products like eggs or milk are currently sold in a competitive market).

Meaning, at least according to Dr. Martin, a hedonic regression analysis is an unsuitable method for applying to ***any*** consumer product.[54] Dr. Martin's view, however, lies in direct contravention to the numerous cases that have adopted and employed hedonic regressions as a

---

[54] "You're unable to provide any examples of a consumer product that is within a perfectly competitive market?; [Dr. Martin] A. No, honestly, not many. And I'm not surprised; right? And that's really the reason why this tool can't be used for the purposes that Mr. Weir is proposing to use it for." Ex. 1(d) at 743:24-744:4.

- 34 -

means for measuring price premiums on a classwide basis for a wide range of products,[55] including products in the wipes (and flushable wipes[56]) consumer space.  Dr. Martin's skewed or ill-informed view has, in effect, already been rejected by these Courts.

Notably, when asked for an example of a perfectly competitive market at the evidentiary hearing, Dr. Martin would not acklowledge, for example, infant formula, olive oil or lawn seed – *even though* courts have approved of the use of hedonic regression to calculate price premium impact for each of those products.  *See Hasemann*, 331 F.R.D. at 277–78 (approving hedonic regression analysis for infant formula); *Kumar*, 2016 WL 3844334, at *10 (approving hedonic regression analysis for olive oil); *Scotts*, 304 F.R.D. at 414 (approving hedonic regression analysis for lawn seed).

Further, while Costco and Dr. Martin purport to rely on the "academic literature" to argue perfect competition is a necessity for hedonic regression, even a cursory review of that literature suggests otherwise.  *See*, *e.g*., Ex. 1(a) at 220:1-6 (Mr. Weir: acknowledging Sherwin Rosen's suggestion in 1974 that perfect competition "might be necessary," but clarifying that "if you read the updated literature he later goes on to say that many of these original assumptions can be relaxed and still obtain reliable results").  For example, several articles submitted by defendant Proctor & Gamble in the *Belfiore* action support the "relaxed" nature of the perfect competition condition as originally conceived by Sherwin Rosen in his seminal 1974 article on hedonic regression, and

---

[55]  *See, e.g.*, *Scotts*, 304 F.R.D. at 414; *Hasemann*, 331 F.R.D. at 277–78; *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *10 (N.D. Cal. July 15, 2016).  Dr. Martin said she would not expect appliances to be considered sold in a perfectly competitive market.  Ex. 1(d) at 742:24-743:6

[56]  *See, e.g.*, *Pettit v. Procter & Gamble Co.*, No. 15-cv-02150-RS, 2017 WL 3310692, at *3-*4 (N.D. Cal. Aug. 3, 2017).

applied the methodology to markets with imperfect competition.[57]   And, despite Costco's contention that Anstine "***assumed*** that the yogurt market . . . was perfectly competitive" in his 2007 article, *Organic and All Natural: Do Consumers Know the Difference?*, Costco Brf. at 12 (emphasis in original), that article measured the impact of brand on price, which would not be possible in a perfectly competitive market.[58]   *See* Ex. Q to the Weinberger Decl.

Next, the cases cited by Defendant Costco for its perfect competition argument are easily distinguishable.  *NJOY* involved false advertising of products in the entirely new e-cigarette space. 2016 WL 787415, at *8.  Flushable wipes, to the contrary, have been on the market for more than a decade.  What is more, in *NJOY*, plaintiffs' expert candidly admitted that his *Bayesian hedonic regression* model "may not measure 'the impact on the market price had the alleged claims not been made,'" (*id.*) and, speaking to defendant's point as applied specifically to *NJOY*, "nor does he dispute that the e-cigarette market is unstable."  Plaintiffs' expert, there, further admitted that his regression would not be appropriate in the context of the e-cigarette market as the regression "would not provide a reliable estimate of price differential attributable to NJOY's safety claim" in the context of "the relatively new e-cigarette market."  *Id.*

---

[57]   *See*, *e.g.*, Ex. K to the Declaration of Harold P. Weinberger in *Belfiore*, 2:14-cv-04090, dated September 11, 2019 ("Weinberger Decl."), Freeman, A. Myrick III, *Hedonic Prices*, *Property Values and Measuring Environmental Benefits: A Survey of the Issues*, 81 Scandinavian J. Econ. 154, 158-64 (1979)) (applying hedonic regression technique to determine whether or not air pollution has a bearing on housing prices despite "market failure" concerns); *see also* Ex. J to the Weinberger Decl., Palmquist, Raymond B., *Property Value Models*, 2 Handbook of Environ. Econ. 764, 784-85 (2005) (hereinafter "Palmquist") (applying hedonic model to determine impact of environmental quality on property values despite that "real estate markets are subject to a variety of transactions and moving costs").

[58]   *See* Ex. 1(d) at 704:16-22 ("I could have added a brand variable into that, although in some sense, the existence of brands is evidence that the market's not perfectly competitive.").

Defendant reliance on *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) and *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010) ("*Zyprexa*") are equally misplaced.  Both decisions arose out of Racketeer Influenced and Corrupt Organizations Act ("RICO") claims, rooted in allegations and elements of fraud, which require reliance.  *See McLaughlin*, 522 F.3d at 224 (discussing the "efficient market" for the purposes of reliance in a RICO claim); *Zyprexa*, 620 F.3d at 133-34 (discussing an "efficient market" in the context of a "but-for causation" analysis and the specific "reliance on a misrepresentation" at issue in the RICO claims).  The nature of the RICO claims there, and the particular discussions on reliance, are entirely distinct from Plaintiff's false advertising claims here.  This Court has already considered, and rejected, the application of *McLaughlin* and *Zyprexa*.  *See* Certification Order at 549 (*McLaughlin* is not controlling here); *Belfiore v. P&G*, 311 F.R.D. 29, 70-71 (E.D.N.Y. 2015) ("[t]his case is not barred by *Zyprexa*"; "*Zyprexa* is distinguishable"); *see also* Certification Order at 500 ("Zyprexa remains inapplicable.").  Defendants cannot reclassify the instant litigation as fraud-on-the-market to fit these unrelated decisions.[59]  *Cf. In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 83 (D. Conn. 2009) (addressing the presence of an "efficient" market in connection with the invocation of a "fraud-on-the-market" theory); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209(KBF), 2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013) ("In order for the fraud on the market theory to apply, plaintiffs must demonstrate that the securities at issue traded in an efficient market.").

---

[59]   *McLaughlin* and *Zyprexa* do not involve, and make no mention, of "perfect competition," "perfectly competitive," regression, hedonic regression or price premium analyses.

3.      **"Flushable" Is a Sufficiently Distinctive Term for the Purposes**
**of Certifying Classes and Supporting Common Injury on a**
**Classwide Basis Analysis**

While this Court identified several definitions of "flushable," it rejected Defendants'

argument that the "term . . . is too amorphous and idiosyncratic to be the subject of one common

definition." Certification Order at 530.  Rather, the "flushability representation is sufficiently

distinctive that it can be isolated from other representations made on the label." *Id*. at 531.  This

is particularly true given that all of the proffered definitions of "flushable" have a common theme

– the products must break apart (or disperse) in a reasonable time. *Id*. at 520-23.  Thus, as

explained by this Court, "flushable" is more akin to "a promise about a product characteristic"

rather than mere puffery, such as the term "better" in *Hughes v. Ester C Co.*, 317 F.R.D. 333, 345

(E.D.N.Y. 2016).  Certification Order at 530-31 (the term "The Better Vitamin C," unlike

"flushable," was "so amorphous that plaintiff's expert could not disentangle the impact of the word

'better' from other non-misleading representations which could have been seen as substantiation

for that word").

Although multiple definitions of the word "flushable" exist, all sources agree that for a

product to be deemed "flushable" – that is "safe for sewer and septic systems" – it must disperse

when agitated.  ***None*** of the Flushable Products sold by defendants disperse when agitated.

Defendants' Flushable Wipes are, therefore, not "flushable" under any available definition or

guideline (detailed below) because, among other reasons, the products cannot safely pass through

a homeowners' plumbing, sewer or septic system due to their nondispersability.

a.      **"Flushable" as Defined by The Association of the**
**Nonwoven Fabrics Industry ("INDA")**

INDA is an industry group that was created by the manufacturers and retailers of so-called

flushable wipes.  INDA is funded and influenced (if not wholly controlled) by the manufacturers

and retailers of so-called flushable products.  *See* Pltf. Opp. Class Br. at 2-5.  Beginning in 2008, and most recently in May 2018, INDA issued guidelines (four in total) for assessing the flushability of disposable nonwoven products.

Each of the INDA guidelines offered a definition of flushable, the two most recent Guidelines (2013 and 2018), defined flushable as:

| **Under GD3 (2013)**, the products must: (1) "clear toilets and properly maintained drainage pipe systems when the supplier's recommended usage instructions are correctly followed;" (2) "pass through wastewater conveyance systems and be compatible with wastewater treatment, reuse and disposal systems without causing system blockage, clogging or other operational problems;" and (3) "is unrecognizable in effluent leaving onsite and municipal wastewater treatment systems and in digested sludge from wastewater treatment plants that are applied to soil." | **Under GD4 (2018)**, the products must: (1) "clears toilets and properly maintained draining pipe systems when the suppliers recommended usage instructions are correctly followed;" (2) "passes through properly maintained wastewater conveyance systems and is compatible with wastewater treatment, reuse and disposal systems without causing system blockage, clogging or other operational problems;" and (3) "is unrecognizable in effluent leaving on-site and municipal wastewater treatment systems and in digested sludge from wastewater treatment plants that are applied to soil." |
|---|---|

*See* Certification Order at 522; GUIDELINES FOR ASSESSING THE FLUSHABILITY OF DISPOSABLE NONWOVEN PRODUCTS (4th ed. 2008), https://www.edana.org/docs/default-source/default-document-library/guidelines-for-assessing-the-flushability-of-disposable-nonwoven-products-ed-4-finalb76f3ccdd5286df88968ff0000bfc5c0.pdf?sfvrsn=6.

### b. "Flushable" as Defined by the FTC's Consent Order with Nice-Pak

The FTC Consent Order defined "flushable" as: "disperse[] in a sufficiently short amount of time after flushing to avoid clogging, or other operational problems in, household and municipal sewage lines, septic systems, and other standard wastewater equipment[.]"  Certification Order at 494.

      **c.**     **Defendants' Flushable Wipes Do Not Qualify as**
                 **"flushable" as Defined by Robert A. Villée – the**
                 **Executive Director of PARSA and Prior Chair of WEF**

Mr. Villée attested that, as of November 2016, "***no product*** marketed as 'flushable' in the United States, other than toilet paper, breaks down in consumers' drain lines. . . . ." *See* ECF No. 273 at ¶20.  According to WEF,[60] a nonprofit association of water quality professionals, in order for a product to be truly flushable it must be dispersible.

"The industry reference for dispersability is two-ply toilet paper . . . [which] starts to break apart when the toilet is flushed and is indistinguishable in the wastewater system in a matter of second. . . .   Anything labeled as flushable should start to break apart during the flush and completely disperse within 5 minutes. . . .   Our mantra is, 'It's not flushable if it's not dispersible. . . .'"[61]

      **d.**     **Inclusion of the "Flushable" Claim in Mr. Weir's Model**
                 **Does Not Require Individualized Inquiries into Each**
                 **Class Members' Understanding of the Term**

Mr. Weir, in turn, properly focused his regression analyses on measuring the economic impact of the use of the term "flushable," which, as determined by this Court, is sufficiently defined for purposes of identifying a model capable of calculating classwide damages at the class certification stage.  Certification Order at 530-31. "How any one person defines that term from an economics perspective does not change the harm as [Mr. Weir] underst[ood] it as alleged by

---

[60]   WEF "is a not-for-profit association that provides technical education and training for thousands of water quality professionals who clean water and return it safely to the environment." *See* Water Env't Fed., https://www.wef.org/ (last visited on Sept. 23, 2019).

[61]   Water Environment Federation, *Stop, Don't Flush That* (June 12, 2013), http://news.wef.org/stop-dont-flush-that/ (last visited September 22, 2019).

plaintiffs." Ex. 1(a) at 91:14-16.[62]   In fact, Plaintiff "has no burden to establish that there is a uniform understanding among putative class members as to the meaning of 'flushable,' or that all or nearly all of them shared any specific belief." *Pettit*, 2017 WL 3310692, at *3; *Hughes*, 317 F.R.D. at 345 ("[I]t is not necessary at this stage to demonstrate that the allegedly false and misleading representation carries a uniform definition").   All that matters is "whether a ***reasonable*** consumer was misled by the claim" that the wipes were flushable.   *See id*. at 346 (emphasis in original).   And "whether or not the product name was misleading or deceptive to a reasonable consumer is a single question of fact that satisfies the commonality element." *Ackerman*, 2013 WL 7044866, at *10.

Despite admitting that GBL §349 "does not require that all consumers have the same understanding of a representation," Costco argues, without support, that even assuming a "single reasonable consumer definition of 'flushable,' *hedonic regression* requires that all market participants share the same understanding of that term." Costco Brf. at 36, n.13 (emphasis in original).   As discussed above, and explained by Mr. Weir, this is untrue. *See also*, *e.g*., Ex. 1(a) at 224:15-18 (explaining that Mr. Weir's model does not look "at how individuals interpret the claim"; rather, it looks "at the economic impact on using that claim on a manufacturer's package"). Costco's reliance on *ConAgra* in support of this concept, as well as its contention that "flushable" lacks a clear definition, is misplaced. *See* Costco Brf. at 35-36.   In *ConAgra*, plaintiff's theory of liability was that a "100% Natural" label misled consumers specifically because Wesson Oils contained no genetically modified organisms ("GMOs"), but plaintiff's regression model did not seek to segregate the price attributable to the "no GMOs" claim. *ConAgra*, 90 F. Supp. 3d at

---

[62]   *See also* Ex. 1(a) at 91:1-24 (Weir: "the precise definition of "flushable" does not change the fact that the challenged products claimed on their label to be flushable and that is what I'm measuring in my model.").

1024.[63]   Here, Mr. Weir's regression properly focuses on the "flushable" claim, which does not

hinge on a nonequivalent and unsubsumed term that Mr. Weir failed to accounted for.[64]

### F.     The "Flushable" Claim Has Consistently Appeared on Defendants' Labels

Mr. Weir, as confirmed through his testimony at the evidentiary hearing, collected example

labels to determine products' characteristics.   In addition to the labeling obtained through

discovery, Mr. Weir coordinated visits to retail stores and online searches to obtain further images.

Ex. 1(a) at 27:3–15.   In addition to the fact that economic publications confirm that it is

unnecessary to collect each and every version of the labels of all potentially relevant products, Mr.

Weir confirmed that there was no material change to the labeling of, or advertising claims included

on, the Flushable Products.   It is undisputed that the word flushable appeared prominently on each

of the Flushable Products – and in the name of the actual products – from the introduction of the

products to the present.   Notwithstanding Defendants' efforts to convince this Court that the

"flushable" claim has little to no value,[65] even Kimberly-Clark's "current" label for its Cottonelle

Flushable Wipes product continues to prominently contain – ***in the actual product name*** – an

emphasis on flushable:

---

[63]   Ultimatley, Mr. Weir's hedonic regression analysis, along with a conjoint study, were approved in *ConAgra*. *Id*. at 1032.

[64]   In *ConAgra*, the Court considered evidence – both in the form of testimony and market or economic studies – that "100% Natural" and "non-GMO" were not equivalent claims. *See id*. at 1024.   To the extent Defendants argue that Mr. Weir's model fails to account for the "safe for sewer and septic" claims on the Flushable Products' labels, Mr. Weir has explained that that claim is subsumed by the "flushable" claim, and no similar evidence is before the Court that would justify treating the claims as separate.   Indeed, while "non-GMO" is an "'extremely specific'" term that is not necessarily incorporated within the term "All Natural," a wipe must be "safe for sewer and septic" in order to be "flushable" and break down in a reasonable amount of time.   Certification Order at 520-23.

[65]   Kimberly-Clark Brf. at 18; Costco Brf. at 15-16, 30-31; Ex. 1(d) at 646:5-25; 647:1-19.



*See* ECF No. 357-11, Kimberly-Clark Ex. H, at 14.

Defendants suggest that ancillary changes to the products at issue – ranging from, *e.g.*, adding a picture of toilet paper (*id*. at 1, 4), changing part of the product name from "Fresh" to "Fresh Care," (*id*. at 1, 8), removing a puppy picture (*id*. at 1, 10), changing part of the product name from "Flushable Moist Wipes" to Flushable Cleansing Cloths," (*id*.), adding "clean ripple" and "wavy clean ripple" representations (*id*. at 1, 12, 13), etc. – somehow alters the analysis. But they cannot point to economic or legal authority to support their position. From a practical perspective, product labeling changes are fluid and are at issue in every false advertising case. From a legal perspective, secondary labeling changes do not overwhelm a thorough and properly performed hedonic regression analysis and will not serve to defeat predominance or class

certification.[66]  This is particularly true where, as Mr. Weir has demonstrated and testified here, a variable of interest (here, the flushable claim) has remained constant over time despite changes to other immaterial variables.  Ex. 1(a) at 28:2-23 (discussing the consistency of the flushability claim of product labeling).

Mr. Weir's selection of attributes, variables or characteristics was based on a wide-range of sources, including the review of actual product labels, product images obtained through discovery or store visits and IRI materials.  Based on that pronounced exercise, Mr. Weir constructed a model that included characteristics that, in his experience performing hedonic regression analyses from start-to-finish, were appropriate to isolate and then measure the percentage value of the flushable representation on price.[67]  In the face of Mr. Weir's economical support and well-reasoned approach, Defendants grasp at any nuanced change in labeling.  By way of example, defendant Kimberly-Clark points to the font size – "sometimes the word 'flushable' was written in small type" . . . at other points it was written in much larger type" Kimberly-Clark Brf. at 22-23 – as a purported oversight.  Defendant Costco provided its own laundry list of what it considers "important" attributes, including "how a wipe dispenses."  Costco Brf. at 42-43.  Neither Defendants cite to any economic or legal authority to support its position these purportedly "important" attributes (*e.g.*, font size or dispensing process) were necessary for inclusion in Mr. Weir's analysis.  And, neither defendant nor, their experts, could speak to the controls that Mr. Weir put in place and the influence those controls had over their inventory of inconsequential

---

[66]  *Hasemann*, 331 F.R.D. at 251, 255 (certifuying class despite changes in advertising and labeling); *Langan*, 2017 WL 985640, at *2 (certifying class of notwithstanding *varied* "natural" label claims).

[67]  Detail pertaining to Mr. Weir's selection of attributes, as well as the acceptable controls he put in place, is discussed at Plaintiff Brf. at 14-17, 25-26, 28-30; *see also* Weir Supp. KC Decl. at ¶¶37-40, 55-70; Weir Supp. Costco Decl. at ¶¶37-41, 57-73.

critiques.   At best, the sole source of support for the inclusion of extraneous and irrelevant attributes is internal company surveys or assessments they performed for sales and marketing purposes. *See* ECF Nos. 357-6, 357-7, 357-8, 357-10, 357-11, 357-12, 357-14, Kimberly-Clark Exs. C, D, E, G, H, I, K.

Costco, for example, relies on an untested declaration by witness Kim Babusik.[68] Ms. Babusik, who did not testify before this Court and was not subject to cross examination as to any studies or surveys conducted by or on behalf of Costco, relied on (1) "an 'Attitude and Usage' study to evaluate the market";[69] and (2) a Kimberly-Clark (not Costco) study or survey. *See* Costco Brf. at 43.  Defendants cannot depend on these surveys as undisputed facts.  The specific objective and scope of the "Attitude and Usage" study, on its face, was on a segment identified as the "moist toilet tissues (MTT) category" with an emphasis on several points unrelated to isolating flushability as an attribute or purchase driver, such as marketing and "identifying opportunities for growth."  What is more, the "Attitude and Usage" study relied on by Costco was performed in 2011 and was commissioned for internal marketing strategies; not for the purposes of determining the value of attributes.

Kimberly-Clark also relies on untested studies.  Worse, to introduce its support, Kimberly-Clark depended on witness Ken Champa, who testified that he is the *current* senior brand manager of the Cottonelle brand[70] and has held that position "for just over two and a half years."  Ex. 1(b)

---

[68]   Ms. Babusik is, or was as of 2015, the Vice President of Customer Technical Support at Nice-Pak Products, Inc.  *See* Declaration of Kim Babusik in Support of Costco's Motion to Deny Class Certification ("Babusik Declaration"), ECF No. 195 at ¶1.

[69]   *See* Babusik Declaration at ¶6.

[70]   Mr. Champa testified that his brand category "covers Cottonelle dry toilet paper and Cottonelle flushable wipes,"  Ex. 1(b) at 290:5-6, demonstrating that, even internally, Kimberly-Clark segmented toilet paper and flushable wipes together.  Mr. Champa further testified that there is no

at 239:6-8.  Mr. Champa testified that, in his experience, Kimberly-Clark does not study or break down the value of a particular attribute or attributes within its products.  *Id*. at 292:22-293:4.  He could not, however, speak to what was done before he worked at Kimberly-Clark.  *Id*. at 293:5-14.

Of the seven studies or other exhibits that Kimberly-Clark introduced through Mr. Champa at the evidentiary hearing, only one (*see* ECF No.357-8, Kimberly-Clark Ex. E, an Executive Story for: FCC Project OFFSPRING Product Evaluation and Purchase Drivers) (the "Purchase Driver Study") was performed during his tenure as brand manager, with the earliest study relied on by Kimberly-Clark being performed in 2005, nearly 15 years ago.  In fact, Mr. Champa said that the Purchase Driver Study was the sole study Kimberly-Clark introduced to the Court through his testimony that he had ever seen (let alone have knowledge of) prior to his preparation for the evidentiary hearing.  Ex. 1(a)-(b) at 329:21-330:2.  He had no knowledge of any others.

For example, in connection with his familiarity with Kimberly-Clark Ex. G (ECF No. 357-10, Quantitative Research Summary, November 2012), which Mr. Champa said he saw for the first time "last week" (in other words, the week prior to August 6, 2019), Mr. Champa testified:

> Q     Do you know who performed this study?
>
> A     I do not know the direct source of who performed the study, no.
>
> Q     Do you know whether Kimberly-Clark had any role in the performance of the study?
>
> A     I do not.
>
> Q     Did you have any role in connection with the performance of this study?
>
> A     I did not.
>
> Q     Do you have any detail whatsoever as to how the study was conducted?
>
> A     I do not.

---

flushable segment at Kimberly-Clark, *id*. at 290:15-16, and that Kimberly-Clark sold flushable products under another internal brand that does not fall under his purview, *id*. at 290:7-14.

- 46 -

> Q      Do you know whether or not it was conducted completely independently, completely by Kimberly-Clark or as a collaboration?
>
> A      I do not.

Ex. 1(b) at 309:3-23.  Despite Mr. Champa's unfamiliarity with these studies or surveys, Kimberly-Clark repeatedly cites to and inappropriately relies on his views and conclusions derived from those documents in its post-hearing brief.  *See* Kimberly-Clark Brf. at 20, 22, 36, 47, 53.

Mr. Champa confirmed that Kimberly-Clark examined "purchase drivers" for "marketing purposes" (*e.g.*, Ex. 1(b) at 303:5-305:10; 318:21-319:5); not for the purposes of determining the value of attributes.  To the extent Defendants continue to insist that purchase drivers[71] – and not value measured and calculated through a hedonic regression analysis – are determinative here, Kimberly-Clark's own studies fail to support the notion that "flushable" is unimportant or has zero value to consumers.  *E.g.*, Purchase Driver Study.  Kimberly-Clark's 2017 Purchase Driver Study sought to break down, on a percentage basis, the key drivers among consumers who have used Cottonelle flushable wipes.  *Id.* at KCC-Kurtz0020286.  According to Kimberly-Clark's own study, ***"flushable" was considered to be 8% of overall significance to consumers' key or important drivers***.

While Mr. Weir's hedonic regression analysis and Kimberly-Clark's key driver analysis are distinct, and evaluate the benefit of the "flushable" claim from different perspectives, the results are difficult to ignore:

➤ Kimberly-Clark's assessed benefit of flushable as part of the overall product:          **8%**
➤ Mr. Weir's measured and calculated value of Costco's "flushable" claim:                **8.5%**
➤ Mr. Weir's measured and calculated value of Kimberly-Clark's "flushable" claim:        **6.2%**
➤ Mr. Weir's measured and calculated value of Proctor & Gamble's "flushable" claim:  **7.9%**
➤ Mr. Weir's measured and calculated value of the "flushable" claim in *Pettit*:          **9.1%**

---

[71]   Kimberly-Clark Brf. at 7, 18, 22; Costco Brf. at 3, 5,

The percentage value is strikingly similar.[72]

## III.   CONCLUSION

Plaintiff has further substantiated compliance with Rule 23(b)(3)'s predominance requirement – as requested by the Second Circuit – by ***performing*** hedonic regression analyses that demonstrate classwide injury in the form of price premiums associated with Defendants' "flushable" claims.  Defendants have failed to identify any arguments that warrant decertification of the classes.  Rather, they quibble with Plaintiff's expert's methodology inputs and arbitrarily manipulate the contours of his damages model in their quest to generate a favorable result.  But these arguments do not deem the damages model inadmissible at the class certification stage, and they do not demonstrate that the model is inconsistent with Plaintiff's theory of liability.  Defendants' arguments seeking to exclude Plaintiff's expert's opinions should be rejected in their entirety, and the Court's Certification Order should be upheld.

DATED:  September 23, 2019                     Respectfully submitted,

                                                              ROBBINS GELLER RUDMAN
                                                                & DOWD LLP
                                                              SAMUEL H. RUDMAN
                                                              ROBERT M. ROTHMAN
                                                              MARK S. REICH
                                                              VINCENT M. SERRA


                                                              */s/ Mark S. Reich*
                                                              MARK S. REICH

---

[72]   The same document, Exhibit E, further highlights the flushable claim and, specifically, the manner in which Kimberly-Clark emphasized the attribute in its advertising.  *See* Ex. E, KCC-Kurtz0020274 ("restage pack design ***prioritizes flushability claim***").

- 48 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
mreich@rgrdlaw.com
vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
MARK DEARMAN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com

*Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on September 23, 2019, I authorized a

true and correct copy of the foregoing document to be electronically filed with the Clerk of the

Court using the CM/ECF system, which will send notification of such public filing to all

counsel registered to receive such notice.

*/s/ Mark S. Reich*
MARK S. REICH

ROBBINS GELLER RUDMAN
 & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
mreich@rgrdlaw.com