# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| D. JOSEPH KURTZ, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:14-cv-01142 |
| | : | |
| | : | CLASS ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| KIMBERLY-CLARK CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

| | | |
|---|---|---|
| GLADYS HONIGMAN, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:15-cv-2910 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| KIMBERLY-CLARK CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**THIRD SUPPLEMENTAL DECLARATION OF JEANNE C. FINEGAN, APR, CONCERNING MEDIA PROCESS AND METHODOLOGY QUESTIONS**

# INTRODUCTION

1. I am the Managing Director and Head of Kroll Notice Media Solutions ("Kroll Media"),[1] a business unit of Kroll Settlement Administration LLC ("Kroll"). This declaration (the "Declaration") is based upon my personal knowledge as well as information provided to me by my associates and staff, including information reasonably relied upon in the fields of advertising media and communications.

2. Pursuant Paragraph 6 of the Court's Preliminary Approval Order, dated May 19, 2022 [Doc. 439], Kroll was appointed as the Claims Administrator to provide notification and claims administration services for the class-wide settlement reached in *Kurtz v. Kimberly-Clark Corp.*, et al., No. 1:14-cv-1142 (PKC) (RML) and *Honigman v. Kimberly-Clark Corp.*, No. 2:15-cv-2910 (PKC) (RML), collectively, the "Actions"*)*.[2]

3. This Declaration supplements my declaration filed on April 5, 2022 [Doc. 432-2] (the "Finegan Declaration") and a second declaration filed on August 31, 2022 [Doc. 450-1] (the "Second Supplemental Declaration").  This declaration (the "Third Supplemental Declaration") addresses questions raised by the Court during the hearing held on September 7, 2022(see: *Transcript of Civil Cause for Fairness Hearing Before Honorable Pamela K. Chen* at p. 41 to 50), concerning the notice plan process for the settlement agreement entered into in connection with the Action (the "Settlement Agreement"), which notice plan commenced on June 17, 2022, and was substantially completed on July 31, 2022.

## DETAILS CONCERNING NOTICE PLAN DISTRIBUTION

4. As described in Second Supplemental Declaration, due to Kroll's optimizations and active management, the Notice Plan exceeded the original reach projections of 72% and

---

[1] Capitalized terms used but not defined herein have the meanings given to them in the Settlement Agreement (as defined below).

[2] The qualifications of myself and Kroll are set forth in the Finegan Declaration submitted concerning Preliminary Approval, dated April 5, 2022 [Doc. 432-2].

ultimately, reaching an estimated 81% of the targeted Settlement Class Members nationwide, by serving over 161,700,000 online display, search, social impressions with cross-device targeting on desktop and mobile, a press release, a settlement website, and a toll-free number.

## **METHODOLOGY FOR NOTICE PLAN DEVELOPMENT**

5.  To develop the Notice Plan and to validate its results, Kroll utilize best-in-class nationally syndicated media research data provided by Simons-GfK Mediamark Research and Intelligence, LLC-Simmons,[3] ("MRI-Simmons") and comScore,[4] among others. This market research and intelligence, among other insights, reports that people who buy certain products also are likely to read and view certain publications and websites. Accordingly, this research measures, in quantifiable terms, the media consumption habits as well as how many people had the opportunity to see an advertisement.

6.  These data resources are used by advertising agencies nationwide as the basis to select the most appropriate media to reach specific target audiences. The resulting key findings are instrumental in Kroll's selection of media channels and outlets for determining the estimated net audience reached through the Notice Plan. Specifically, this research identifies which media channels are favored by the target audience (*i.e.*, the Settlement Class Members), such as their browsing behaviors on the internet, preferred social media channels, and which magazines they read. The next step is to determine how many people will see the ads and how many times they will see it. In advertising, this is referred to as the reach and frequency analysis. Reach is the net new number of individuals exposed to an advertising message at least once within a given period of time. It is usually expressed as an estimated percentage. Frequency is the average number of times a person is exposed to an advertisement during a specific advertising campaign.

---

[3] MRI-Simmons's *Survey of the American Consumer*® ("MRI-Simmons") is the industry standard for magazine audience ratings in the U.S. and is used in the majority of media and marketing agencies in the country. MRI provides comprehensive reports on demographic, lifestyle, product usage and media exposure.

[4] comScore is a global internet information provider on which leading companies and advertising agencies rely for consumer behavior insight and Internet usage data.

Reach and frequency are companion metrics used in the advertising industry and embraced by the Courts to objectively quantify the exposure of an advertising campaign.

7. Here, the reach percentage exceeds the guidelines as set forth in *The Federal Judicial Center's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*[5] to effectuate a notice program which reaches a high degree of Settlement Class Members.

8. The foundation for our analysis is derived from MRI-Simmons software. As its name suggests, this media research technology allows us to fuse data and accurately report to the Court the estimated percentage of the target audience that will be reached by the notice component and how many times the target audience will have the opportunity to see the message. Here, we used the MRI survey definition to profile Settlement Class Members and create a highly specific and appropriate target audience for the Settlement Class: *Purchasers of Cottonelle Fresh Care moist wipes or 'other' brand moist toilet paper* (the "Target Audience").

9. Based on the Target Audience definition derived from our media research, the size of the Target Audience is approximately 9.3 million individuals in the United States. Note that the Target Audience does not precisely match the definition of the Settlement Class in these Actions, as is commonplace in class action notice plans, particularly where, as here, an exact or even estimated class size is impossible to calculate given the lack of adequate sales data. Utilizing an overinclusive proxy audience maximizes the efficacy of the Notice Plan and is considered a best practice among media planners and class action notice experts alike. Using proxy audiences is also commonplace in both class action litigation and advertising generally.[6]

---

[5] FED. JUD. CTR., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), *available at* https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf. The guide suggests that the minimum threshold for adequate notice is 70%. *See id.* at pp. 1, 3.

[6] If the total population base (or number of class members) is potentially unknown, it is accepted advertising and communication practice to use a proxy-media definition, which is based on accepted media research tools and methods that will allow the notice expert to establish that number. The percentage of the population reached by supporting media can then be established. *Duke Law School, GUIDELINES AND BEST PRACTICES IMPLEMENTING 2018 AMENDMENTS TO RULE 23 CLASS ACTION SETTLEMENT PROVISIONS*, at 56. This publication is available online at: https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1003&context=bolch.

10.     This definition casts a wide net to reach an overinclusive target audience of over 9.3 million people.  By using a proxy definition to cast a wider net, the Notice Plan takes into account those who: 1) infrequently purchase the product; and 2) those who are not brand loyal, or may have switched brands.

**PROCESS CONCERNING HOW DIGITAL ADS REACH A TARGET AUDIENCE**

11.     To ensure that digital display[7] ads are shown to the correct person, in the correct environment and at the right time, Kroll employed a media buying tactic known as "programmatic advertising". This tactic combines consumer data[8], computer software and algorithms. Here, the Notice Plan incorporated transactional data for purchasers of Cottonelle and 'other' moist wipes, and to cast a wider net, adults generally who are between the ages of 18 to 54 years of age.[9]

12.     In practice, when a user visits a website, an IP[10] connection between the user's device and the publisher's webserver is established. The website then flags available ad tags so that the ad server can analyze data about the user such as demographic attributes or location. This information is shared with advertising exchanges (digital advertising marketplaces for ad space) where ad buyers can bid on the ad unit, relevant to the campaign. If the ad unit is user-relevant, a bid is offered. Upon winning the bid for the ad unit, the ad is downloaded on a webpage for a user to see and this counts as an impression.

---

[7] Digital display banner ads appear across online publishers which are not social media platforms.  Social media ads appear only on social media platforms, such as Facebook and Instagram. Social media advertising is separate and apart from display advertising, as social media advertising focuses on demographic characteristics and followers of certain pages. Here the social media ads targeted followers of Cottonelle, Cottonelle Fresh on Facebook and Cottonell on Instagram.  Additional targeting on social media focused on demographic characteristics.  The notice program also retargeted (*i.e*., provided reminder ads), those who visited the Settlement website.

[8] Third party data may include transactional purchase information and other information from various sources. Third-party data is shared or purchased on marketplaces or exchanges, *i.e.* Google Ad Exchange or AppNexus.  Both Google Ad Exchange and AppNexus represent inventory from millions of websites.

[9] MRI reports that over 65% of this target are between the ages of 18-54.

[10] An IP address, or Internet Protocol address is a series of numbers that identifies any device on a network.  Computers use IP addresses to communicate with each other both over the internet as well as on other networks.

13. An impression is simply an occurrence of an ad presented to a user. It is frequently referred to as an 'opportunity to see' an advertisement. Each time an ad is shown via page, or search result, an ad impression is counted.

14. Both digital banner ads and social media ads include relevant information for the user to self-identify. If the user clicks on the ad, an embedded link takes them to the Settlement website, where they can learn more about the Settlement and potentially file a claim.

15. Digital banner ads and social media ads are tracked and accounted for through various means including Urchin Tracking Module ("UTM") codes. UTM codes are used to track, among other things, clicks, or other website statistics.

## CONCLUSION

16. The outreach efforts described in the Prior Declarations reflect a particularly appropriate, highly targeted, and contemporary way to provide notice to this class, which has been reasonably calculated to provide notice that is consistent with best practicable court-approved notice plans in similar matters. These efforts are consistent with, and indeed exceed, the Federal Judicial Center's Guidelines concerning appropriate reach, which suggests that the minimum threshold for adequate notice is 70%.

17. In total, this notice plan reached an estimated 81% of the class with an average frequency of three times, resulting in more than 570,000 users visiting the settlement website.

18. I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 11, 2022 in Tigard, Oregon.

Jeanne C. Finegan, APR